[No. 1076-2.    Division Two.    January 27, 1975.]

ELSIE L. ALDRICH, *Respondent,* v. ERVIN T. OLSON, *Appellant.*

G. *Perrin Walker* and *Leslie Stomsvik* (of *Kane, Vandeberg & Hartinger*), for appellant.

*Philip M. Best*, for respondent.

PETRIE, J.—Ervin T. Olson, defendant, occupied a house at Ocean Shores owned by Mrs. Elsie Aldrich, plaintiff, under a lease agreement with an option to purchase. On September 18, 1971, Mrs. Aldrich entered the premises by means of a key which she had retained, noted that some of Olson's furnishings were no longer present, and changed the locks on the premises during Olson's absence. Sometime between September 19 and 28, 1971, Olson returned, broke one of the locks, reentered the premises and removed the remainder of his belongings together with some furnishings which he had installed under the terms of the lease. On September 28, 1971, he sent Mrs. Aldrich a letter asserting his contention that Mrs. Aldrich's action had breached the lease agreement and that he was thereby terminating the agreement and absolving himself of all responsibility under the lease.

Mrs. Aldrich filed a complaint seeking unpaid rent for the balance of the term of the lease, damages for repairs to the premises, waste allegedly committed by Olson, and cost of completing work which Olson had agreed to perform under the lease, together with attorney fees as specified under the lease. Olson's answer (a) denied any default of the lease on his part; and (b) by way of counterclaim, sought damages resulting from his eviction from the premises, including cost of moving and loss of the benefit of the bargain represented by loss of his option to purchase. The trial court specifically found that Olson committed no waste, but entered a judgment which, in effect, dismissed Olson's counterclaim and awarded judgment in favor of Mrs. Aldrich in the amount

of $3,000 for improvements which Olson failed to perform pursuant to the terms of the lease, $350 for repairs to the premises, $450 for 3 months' unpaid rent, and $850 for attorney fees, together with costs. Olson has appealed. Mrs. Aldrich has not cross-appealed.

The key issue presented by Olson's appeal is whether or not he was unlawfully evicted from the premises by reason of Mrs. Aldrich's change of the locks. We hold that Mr. Olson was "locked out" of the premises under circumstances which constituted an unlawful actual eviction. These are the reasons for our conclusion.

■ Except as limited by the terms of the leasehold, a tenant has a present interest and estate in the property for the period specified, which gives him exclusive possession against everyone, including the lessor. *Conaway v. Time Oil Co.*, 34 Wn.2d 884, 210 P.2d 1012 (1949). Any unlawful act of a landlord which permanently ousts a tenant from physical possession of the premises constitutes an actual eviction. It is difficult to visualize an act of a landlord more specifically intended as a reassumption of possession by the landlord and a permanent deprivation of the tenant's possession than a "lockout" without the tenant's knowledge or permission. Consequently, the real issue on appeal is whether or not changing the locks was an *unlawful* act by the landlord.

Mrs. Aldrich asserts on appeal, as she did at trial, that Mr. Olson's conduct prior to the "lockout" constituted an anticipatory breach of the express covenants of the lease and/or repudiation of the leasehold. Accordingly, she contends that she was justified in changing locks on September 18, 1971.

We examine first whether or not Olson's conduct constituted an abandonment of his leasehold estate such that Mrs. Aldrich could justifiably elect to terminate the lease and sue for damages. *See Pague v. Petroleum Prods., Inc.*, 77 Wn.2d 219, 461 P.2d 317 (1969). The essential facts are set forth by one of the trial court's findings, to which Olson has assigned error only to the italicized portion:

That on September 17, 1971, the plaintiff had become concerned when she had not received rent for the month

of September, which was due on September 1, 1971. That the plaintiff thereupon called the telephone number for the defendant at the residence at Ocean Shores and discovered the telephone had been disconnected. The plaintiff thereafter called the real estate office with whom she had been dealing at Ocean Shores and discovered that the defendant had left and that he was no longer connected with the restaurant he had been operating at Ocean Shores and that the real estate office did not know the defendant's whereabouts. That the plaintiff had received a reply from the defendant's mother at Ocean Shores to a letter, which her attorney had written to the defendant's mother, which also caused her to be concerned. That the plaintiff on September 17, 1971, travelled to Ocean Shores with a Mr. Robert Hanson and discovered that the drapes were drawn, entered the premises with the key she had retained, and discovered a substantial amount of rotten food, stench and garbage; that the defendant's bed and carpeting in the bedroom occupied by the defendant had been removed; that the piano, organ and other items were located in the middle of the living room floor where they would normally not be; that there were a few dishes, a few clothes in the closets, and the place was in a state of disarray; *all indicating that the defendant was no longer actually staying at the premises and that he was intending to move the remainder of his things.* That the plaintiff and Robert Hanson thereupon cleaned up the garbage and straightened up the premises somewhat and changed the locks on the doors and returned to the plaintiff's residence in Bremerton, Washington. Plaintiff left no notice to defendant at the premises:

(Italics ours.)

■ Assuming the validity of the trial court's inferential facts—that defendant was no longer staying at the premises and was intending to move the remainder of his things—the most that can be said of those facts is that Olson no longer intended to *occupy* the premises. Intention not to occupy is not necessarily an intention to surrender the premises to the landlord and abandon the leasehold estate. Legal abandonment contemplates both an act or omission *and* an intent to abandon. *Moore v. Northwest Fabricators, Inc.,* 51 Wn.2d 26, 314 P.2d 941 (1957). Abandonment must be established

by clear, unequivocal and decisive evidence. *Tuschoff v. Westover*, 65 Wn.2d 69, 395 P.2d 630 (1964).

The trial court found that the two parties had discussed extension of the lease for an additional 1-year period. Indeed, in late July 1971, Olson had submitted a signed proposal for an extension in which he agreed to pay the 1972 sewer assessment and one-half of the 1972 property taxes. In addition, Olson's proposal contained an authorization for him to sublease the premises. Mrs. Aldrich took this proposal to her attorney who, on August 9, 1971, wrote Olson at the Ocean Shores address suggesting a meeting to resolve questions prior to entering into any further agreements. Olson denied having received that letter, and no written agreement was ever consummated on any extension or authority to sublease. Mrs. Aldrich testified that she "would have let him have it for another year," but after she received Olson's written proposal, which for the first time suggested a sublease, she "became frightened" and took the proposal to her attorney. Next, she received the letter dated September 10, 1971, from Olson's mother which caused her to be concerned. Then followed the visit to Ocean Shores and the change of locks on her house.

From our review of the record and from the trial court's findings, we cannot find support for any conclusion that Olson ever intended to *abandon* his interest in the leasehold. Certainly there is no clear, unequivocal and decisive evidence that Olson abandoned the leasehold prior to September 18, 1971, to an extent which would justify Mrs. Aldrich's assumption that she could legally accept a *surrender* of the premises.

We turn then to examine the question of whether or not Mrs. Aldrich was justified in assuming that Olson's actions prior to September 18, 1971, constituted an anticipatory breach of the express covenants of the lease.

An anticipatory breach of a promise to perform occurs when words or acts evince an intention to refuse performance. *Trompeter v. United Ins. Co.*, 51 Wn.2d 133, 316

P.2d 455 (1957). There must be either a positive refusal to perform or an inability of the power to perform. *McFerran v. Heroux,* 44 Wn.2d 631, 269 P.2d 815 (1954).

We will assume, without deciding, the somewhat dubious proposition that a tenant's breach of a covenant forfeits his right to continued possession of the premises and, without more, authorizes repossession by the landlord.[1] *See* 3 *Thompson on Real Property* 377 (J. Grimes repl. 1959) for a discussion of how a covenant in a lease is a hermaphrodite controlled in part by the law of property and in part by the law of contracts.

Specifically, the two covenants in the lease, the anticipatory breach of which Mrs. Aldrich relies upon to justify her actions, are covenants (a) to maintain the premises in good repair and (b) to make substantial improvements during the term of the tenancy.

By the terms of the lease, the lessee's promise to keep the premises "in a state of good repair" is coupled with (1) a promise to deliver up the premises without notice at the expiration of the lease in as good a condition as when the lease was executed, excepting the usual conditions of necessary wear and tear and damage by the elements; and (2) a specific grant to the lessor "to enter the leased premises at all times for the purpose of making necessary repairs, . . ." Conceivably, but still questionably, these clauses would authorize the lessor to enter the premises temporarily in order to remove the "substantial amount of rotten food, stench and garbage" which had accumulated on the premises. They do not, however, grant to the lessor the authority to reassume possession of the premises instanter to the exclusion of the lessee. Mrs. Aldrich cannot rely upon them as justification for changing the locks.

Mrs. Aldrich's real theory of justification appears to be that in the few remaining months of his tenancy Olson had

---

[1] The lease provided in part: "If the lessee shall fail to keep and perform any of the covenants and agreements herein contained, the lessor may cancel this lease upon giving the notice required by law, and re-enter said premises, . . ."

no intention to, or indeed that he had lost the power to, complete the improvements to the premises which he was obligated to perform during his tenancy. The trial court found that the lease clause which obligated Olson to make "certain improvements" to the premises was vague, uncertain and indefinite as to what those "certain improvements" would be, but nevertheless found that "the agreement contemplated that they would be of a minimum value of $3,000.00." The trial court also found that during his tenancy, Olson "did make certain substantial improvements" as required by the lease, but they were all removed by Olson when he finally removed all of his own furnishings from the premises.

Because Olson removed all of these substantial improvements and because the lease otherwise provided that if Olson did not exercise his option the improvements would become Mrs. Aldrich's exclusive property without any necessity to reimburse Olson therefor, the trial court awarded Mrs. Aldrich damages in the amount of $3,000. We shall subsequently consider the propriety of that award. However, for the present, we are concerned only about the effect of Olson's removal of the improvements, coupled with the lease provisions as to ownership, upon Mrs. Aldrich's theory that she was justified in assuming Olson would refuse to or could not make those improvements during his tenancy.

Her position is untenable for the following reasons: (1) There was considerable conflict as to the nature and extent of the improvements contemplated and the quality and extent to which Olson had performed them. The trial court's finding that he did make "substantial improvements" negates any intent to refuse performance or any loss of power to perform. (2) Olson's written request for a 1-year extension was still actively pending on September 18, 1971, as evidenced by the trial court's finding that the parties engaged in oral discussions concerning an extension, and by counsel's letter of August 9, 1971, which sought a meeting to discuss the matter before reaching a further agreement.

(3) There is no indication that Olson was intending to fail to exercise his option. Obviously, if Olson exercised his option the matter of improvements would become moot.

In short, the record simply does not support Mrs. Aldrich's assertion that on September 18, 1971, Mr. Olson either repudiated the leasehold, positively refused to perform, or lost the power to perform the covenants of the lease during his tenancy. There is, therefore, no support for the act of changing the locks to the exclusion of Mr. Olson's rightful possession. Accordingly, the "lockout" constituted an unlawful actual eviction.

Eviction, however, does not per se terminate a lease. Eviction confers upon a lessee the alternative remedies of (1) seeking to regain possession and recouping damages; or (2) abandoning the premises within a reasonable time and recouping damages. *See generally* 49 Wash. L. Rev. 350, 351 (1974). One writer has succinctly stated the lessee's options as follows:

> An eviction by the lessor suspends the lessee's obligation to pay rent during the time he is kept out of possession. And instead of resorting to an action to recover possession, the lessee may treat the lease as terminated, thus relieving himself of any obligation to pay rent which would otherwise accrue thereafter. This rule applies when the eviction is constructive as well as when it is actual. In addition, the lessee may sue for damages for breach of the covenant of quiet enjoyment.

(Footnotes omitted.) 1 *American Law of Property* § 3:52 (A. J. Casner ed. 1952).

By his letter of September 28, 1971, Mr. Olson did "treat the lease as terminated." He went further, however, and also voluntarily terminated the option. In his own words, the letter declared in part:

> *I am no longer obligated* under any condition or circumstances in further leasing, renting or *purchasing* the dwelling at Ocean Shores, . . .
>
> . . .
>
> This notice of termination of the lease and the lease

option agreement *does not terminate your obligation* nor responsibility *as Landlord* of the residence.

(Italics ours.)

Accordingly, there is no support for that portion of the judgment which awarded Mrs. Aldrich damages in the amount of $3,000 for unperformed improvements, nor in the award for unpaid rent (Olson did pay September's rent for which he apparently felt responsible because he did regain his possessory interest by the simple expedient of breaking the lock), nor for the award of attorney fees. By the same token, however, Mr. Olson cannot recover on his counterclaim for damages for loss of his option to purchase. He voluntarily terminated that option. There does not appear to be any evidence to support costs of his moving from the premises. The trial court properly dismissed Olson's counterclaim.

As modified herein, the judgment is affirmed. Costs on appeal are awarded to appellant Olson.

ARMSTRONG, C.J., and PEARSON, J., concur.

Petition for rehearing denied March 11, 1975.