In re Vera ADAMS, Debtor.

Vera ADAMS, Plaintiff,

v.

PHILADELPHIA HOUSING AUTHORI-
TY, Edward Sparkman, Trustee, and
James J. O'Connell, U.S. Trustee, De-
fendants.

In re Kim BOWENS, Debtor.

Kim BOWENS, Plaintiff,

v.

The PHILADELPHIA HOUSING AU-
THORITY, Marilyn Lowney, Robert
Byrd, PHA Police Officer # 2, PHA Po-
lice Officer # 3, PHA Police Officer # 4,
Edward Sparkman, Trustee and James
J. O'Connell, U.S. Trustee, Defendants.

Bankruptcy Nos. 113515, 88–128075.
Adv. Nos. 88–09475, 88–128075.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 9, 1989.

Peter D. Schneider, Community Legal Services, Inc., Philadelphia, Pa., for Adams.

Michael Donahue, Community Legal Services, Inc., Philadelphia, Pa., for Bowens.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Terry W. Claybrook, Philadelphia, Pa., for PHA in Adams.

Jose E. Morales, Susan F. May, Philadelphia, Pa., for PHA in Bowens.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

As we advised the parties, our intention, in deciding these adversary proceedings together, was to attempt to eliminate or at least reduce the stream of matters coming before us which raise the issue of whether a particular debtor is a "remaining member of a tenant family," *see* 24 C.F.R. § 912.2 (Definition of "Family") *i.e.*, a person entitled to remain in possession of a public housing unit owned by the Philadelphia Housing Authority (hereinafter "PHA"), after the head of the family dies or moves out (hereinafter referred to as "a remainder"). Our original belief was that this question could be resolved by our formulation of a more specific definition of exactly what a remainder is or should be. However, further reflection of the records made in these proceedings and the post-trial submissions of counsel for the parties in these proceedings and further research of the pertinent authorities convinces us that our original belief as to how to approach and reduce the flow of these matters into our court was incorrect.

We now believe that the issue of who is or should be considered to be a remainder is too fact-determinative for us to lay down any meaningful definition of such a party that will resolve these cases summarily on this point. Further, we believe that public-housing grievance panels and the state courts, rather than this bankruptcy court,

are the appropriate bodies to make these determinations. However, we also believe that the PHA's policy of summary, forcible eviction of parties who are colorably remainders is violative of these parties' rights to due process of law and consistent pertinent federal Regulations. This policy has engendered the substantial number of instances in which remainders have resorted to bankruptcy, because the only sure means of halting their summary PHA eviction is by invoking the automatic stay of a bankruptcy case.

Therefore, we conclude that the PHA must provide an opportunity for a grievance hearing and must obtain a court order before it may evict any party who allegedly is a remainder. Relief from the automatic stay will be accorded to the PHA in the only one of these cases in which such relief was requested, i.e., the *Adams* case, but only on the condition that the PHA must grant that Debtor an opportunity for a grievance hearing and obtain a court order before removing her. Damages of $1,000.00 are also awarded to this Debtor. In addition, we award damages to the Debtor summarily evicted in the other case, i.e., the *Bowens* case, in the amount of $7,500.00. However, we also offer a remittance of these sums and the potential counsel fees of the Debtors' counsel are reduced to $5,000.00 on the condition that the PHA offers leases of premises to both Debtors involved, and that, as recoupment for damages, it allows the *Bowens* Debtor to occupy a unit rent-free, as long as she otherwise remains in good standing, for five years.

## B. PROCEDURAL HISTORY

The instant proceeding was preceded by at least four other matters filed in this court in the past year raising very similar issues of whether particular debtors were remainders who were entitled to remain in premises from which the FHA sought to evict them.[1]

The Adams matter involves VERA ADAMS (hereinafter referred to as "Adams"), a 20–year–old mother of two infants who filed a voluntarily Chapter 13 proceeding on April 20, 1988. On July 15, 1988, although still in possession of a PHA premises, she filed an adversary proceeding seeking to establish both her right to remain in the premises as a remainder and her right to due process of law prior to her eviction. Almost simultaneously, on July 18, 1988, the PHA filed a motion for relief from the automatic stay in Adams' main bankruptcy case in order to obtain permission to proceed to summarily evict her. A consolidated hearing on both matters was conducted on October 13, 1988, and, at its close, we issued an Order of October 14, 1988, maintaining the automatic stay in place pending our final decision and allowing the parties until October 28, 1988, to supplement pre-trial Memoranda which they had submitted in connection with the stay-relief motion.

The *Bowens* matter features KIM BOWENS (hereinafter "Bowens"), a petite (4'11", 88 pounds), 31–year–old mother of a 14–year-old son who also filed a Chapter 13 bankruptcy case on August 10, 1988. Bowens has experienced a far rockier course of dealings with the PHA than has Adams. The adversary proceeding initiated in her case, on August 24, 1988, sought to recover possession of a PHA premises from which, despite her claims as a remainder, she had

---

1. In the first such matter to come before us, *In re Johnson, Johnson v. PHA,* Bankr. No. 87–04918S, Adv. No. 87–0980S, on December 2, 1987, we denied a preliminary injunction to a most undesirable debtor, who attempted to take over her abused lesbian lover's premises upon the tenant's departure. In *In re Taylor, Taylor v. Block,* Bankr. No. 87–05600F., Adv. No. 87–0947S, Judge Fox of this court, on December 18, 1987, also denied preliminary relief to a debtor residing in Section 8, federally-subsidized housing administered by the PHA who claimed to be the wife of a deceased former tenant. A "re-

mainder" issue was also apparently raised in *In re Massenburg, Massenburg v. PHA,* Bankr.No. 88–11537S, Adv. 88–0888S, but this matter was amicably resolved by a stipulation of the parties. A motion by the PHA to obtain relief from the stay to evict a particularly compelling remainder, a 20–year–old woman who was attempting to raise her siblings and other household members after the removal of her mother from a PHA unit on drug charges, was denied by us on July 27, 1988, in *In re Devine,* Bankr. No. 88–11973S.

already been summarily evicted. As of the date on which a hearing on a preliminary injunction seeking to restore her to possession was scheduled, *i.e.*, August 31, 1988, the PHA agreed to allow her to return to the premises pending the outcome of this proceeding. The original trial date of September 29, 1988, was continued to October 27, 1988. In this interval, we tried the *Adams* matters, and, when a further continuance of the *Bowens* hearing was requested, we cautioned the PHA that we intended to decide both this proceeding and the *Adams* matters together, and that therefore a continuance of the *Bowens* proceeding would further delay a disposition of the *Adams* matters. Nevertheless, the PHA reiterated its desire for one further continuance of the *Bowens* proceeding, until November 10, 1988, on which date it was finally tried.

After the trial, we accorded the parties until November 29, 1988, and December 9, 1988, to offer post-trial submissions. The PHA requested a further extension of their briefing until December 23, 1988, which we allowed after again cautioning the PHA that this request would delay disposition of the *Adams* matters.

In this interval, we noted that Adams' Chapter 13 Plan was listed for a confirmation hearing and had been confirmed without objection on December 8, 1988. The Plan made no mention of Adams' intention to assume or reject her purported lease with the PHA, nor had the Debtor filed any separate, pre-confirmation motion seeking assumption or rejection of any lease. The Plan contemplated payment of $2.39 monthly for 36 months, a most modest undertaking.[2] We therefore entered an Order on December 9, 1988, inviting the parties to comment on the impact of confirmation upon the disposition of the matters before us in this case on or before December 22, 1988. Only Adams' counsel accepted our offer.

2. This Plan would not appear to contemplate sufficient payments to pay even the minimum compensation of $5.00 monthly to which the Chapter 13 Trustee is entitled pursuant to 11 U.S.C. § 330(c). However, the Trustee filed a

## C. FINDINGS OF FACT

There are certain factual disputes between the parties in both matters, although most of the disputes relate to varying interpretations of the Debtors on one hand and PHA personnel on the other of communications between the parties. Most of the hard facts are undisputed. The facts which are directly relevant to our ultimate disposition, on basically due process grounds, are the undisputedly accurate recitation of the PHA's procedures regarding remainders recited by its Director of Housing Management. We are required by the terms of Bankruptcy Rule (hereinafter "B.Rule") 7052 and Federal Rule of Civil Procedures (hereinafter "F.R.Civ.P.") 52(a) to present our decision in the adversary proceedings in issue in the form of findings of fact and conclusions of law. Our conclusions of law will be expressed as headnotes in our following discussion.

### 1. FINDINGS re VERA ADAMS

1. Adams became a resident of a PHA scattered-site, four-bedroom house, located at 2209 North 5th Street, Philadelphia, Pennsylvania, in 1970, at age two, when her mother, Wilhelmina Adams, first leased the home as a head of the family's household.

2. In October, 1983, Adams' mother died and her father, Lonnie Artis (hereinafter "Artis"), leased the home as head of the household. Adams continued to live in the home until October, 1985, when she went to live with an older sister named Denise. Thereafter, she moved to a place of her own with a girlfriend, and later moved in with her boyfriend.

3. In February, 1988, pregnant with her second child and experiencing problems with her boyfriend, Adams moved back into the home, with Artis and her brother Lonnie Adams, the latter of whom vacated the premises on March 1, 1988.

report recommending confirmation and therefore our confirmation Order could probably be considered as "ordering otherwise" and hence allowing the Trustee less than his ordinary compensation.

4. Neither Adams nor Artis advised the PHA of Adams' departure from nor her return to the home at the time of her moves.

5. In early April, the PHA approved the longstanding request of Artis, who suffers from numerous physical problems, for a transfer to a one-bedroom PHA apartment designated for the elderly.

6. Upon receipt of this notice, Artis and Adams advised the PHA of Adams' presence in the unit for the first time, and Adams indicated a desire of Adams to rent the home for her family.

7. Adams' request was initially refused solely because she was not at that time listed as a resident of the home on Artis' lease or his 1987 annual "continued occupancy form" (hereinafter "CO") which each tenant is supposed to sign, since she moved into the home after the last CO had been completed.

8. The lack of any prohibition on Adams' taking over the lease upon her father's departure was supported by a document in the PHA files indicating that, upon Artis' anticipated transfer to a PHA unit for the elderly in November, 1985, another sister of Adams then on the lease, Annette, would have the home "turned over to" her.

9. However, Rojer Kern (hereinafter "Kern"), the PHA assistant manager in charge of administering its scattered site program, testified at the hearing that the transfer of Artis to another PHA unit, as opposed to a private housing unit, would preclude the rental of the home to any member of the Adams family as a matter of PHA policy, and that therefore the proposed transfer of the home to Annette in November, 1985, and the statement that possibly tenancy of the home could be transferred to Adams had she been on her father's current lease, were erroneous.

10. On April 18, 1988, observing that the home was occupied despite Artis' departure and contending that he did not know who the occupants were, Kern sent two "squatter" notices to the premises, one demanding that the occupants leave the property and another stating that the PHA "IS NOW RECOVERING POSSESSION OF ITS PROPERTY FROM YOU." These notices both stated that all personalty in the premises would be removed therefrom and stored at the occupants' expense and hence both strongly imply, although they do not directly state, that the occupants will be summarily evicted if they attempt to remain.

11. Kern further testified that, even had he known that the occupant of the home was Adams, Artis' daughter, he would have sent the same letter and followed up this letter with a forcible eviction of the occupants by the PHA's police force without resort to any legal action.

12. Kern did state, however, that there is normally a six-month lag-time from the dispatch of the "squatter" notices until a "squatter" is actually forcibly evicted, and therefore it did not appear that actual eviction of Adams was imminent.

13. Although no action was taken to disturb Adams' possession of the home, either prior to her bankruptcy filing or thereafter, Adams clearly was placed under great stress by being placed in jeopardy of an immediate summary eviction of her and her infant children from the home at any time.

## 2. FINDINGS re KIM BOWENS

1. Bowens moved into a PHA unit at 4590 Merrick Road, Philadelphia, Pennsylvania, located in the Schuylkill Falls public housing project, in 1969 or 1970, with other members of her family, including her older sister, Esther Bowens (hereinafter "Esther").

2. Esther was initially and at most times thereafter listed as head of the household in the premises on the PHA Lease and COs for the unit, although she and several other members of the Bowens family periodically moved in and out of the unit. Bowens herself had been listed as head of the household in the late 1970's for a brief period.

3. In November, 1987, subsequent to the completion of the annual CO by Esther,

Bowens and her son moved back into the unit.

4. In May, 1988, Robert Byrd (hereinafter "Byrd"), the project manager, apparently aware of Bowens' presence in the unit, discussed his concerns about the occupants of the unit with Esther. At this time, Esther signed a letter, written by Byrd, stating that she wanted both Bowens and her boyfriend, Johnny Walker (hereinafter "Walker"), to leave the unit.

5. However, Byrd and Esther both testified that, shortly thereafter, Esther amended the contents of this letter by stating that Bowens could stay in the unit while Esther entered a drug rehabilitation program as long as Walker left. This arrangement was apparently satisfactory to Byrd. It is not clear, however, that the contents of the agreements between Byrd and Esther were ever communicated to Bowens by anyone.

6. Shortly after the final discussion between Esther and Byrd, Esther, on or about June 1, 1988, apparently satisfied that she had arranged to retain her unit upon her return, departed, without telling anyone exactly where she went or how long she would stay, to enter the planned rehabilitation program, maintaining only sporadic telephone contact with Bowens thereafter.

7. Shortly after Esther's departure, Bowens spoke to Byrd and offered to make rental payments, in consideration of her remaining in the unit, of $75.00 every two weeks towards current rent, which was about $80.00 monthly, and towards a rental deficiency of about $550.00 owed by Esther.

8. Bowens believed that Byrd accepted this offer, as he thereafter took two $75.00 payments from her and a $103.00 welfare check of Esther's for the two June payments and first July payment, and gave her a form to take to the welfare office to verify her residence in the unit.

9. There is no evidence that Byrd communicated to Bowens that he rejected her offer or that he discussed the subject of Walker's departure with her. However, Byrd stated that maintaining contact with

Esther and the departure of Walker from the unit were, in his mind, conditions of acceptance of Bowens as a tenant in the unit.

10. In mid-July, apparently communicating same to her for the first time, Byrd informed Bowens that he would not accept her $75.00 tendered as payment for mid-July, and that she must leave the unit unless Esther contacted him and met the condition of removal of Walker from the unit.

11. On July 12, 1988, Byrd sent a letter addressed to Esther, advising that, if she failed to contact him within three days, he would "have your unit vacated." Byrd justified this action by stating that he believed that Walker had remained in the unit, contrary to his agreement with Esther that Walker would move out, and that he "had serious apprehensions" about Walker's activity.

12. Bowens contacted Byrd after receipt of this letter, advised him that it was impossible for her to reach Esther at this time, and reiterated her desire to remain in the unit.

13. Not having heard from Esther as of August 4, 1988, Byrd, accompanied by two PHA police officers, had Bowens physically removed from the unit, boarded it up, changed the locks, and had the water heater removed therefrom.

14. Bowens forcibly re-entered the unit on the evening of August 4, 1988, resumed living there, and filed her instant Chapter 13 bankruptcy case on August 10, 1988.

15. On August 11, 1988, two City of Philadelphia police officers entered the unit, found drugs in the premises, arrested Walker for drug offenses, and detained but released Bowens and another woman in the premises at the time. Bowens again returned to the unit that night.

16. On August 12, 1988, two PHA police officers returned to the unit again around 12:30 P.M., removed Bowens, and boarded it up again. Bowens was then arrested, handcuffed by the PHA police officers (although no testimony of physical

resistance was related), and transported first to Byrd's office, then to a City police precinct office, where she was inexplicably handcuffed to a chair for six hours, and then to the Police Administration Building. Not being fed after almost twenty-four (24) hours in custody, she was released at about 11:00 A.M. the next morning after being fingerprinted and charged with criminal trespass.

17. It is not clear whether and, if so, to whom, on August 12, 1988, Bowens mentioned that she had filed bankruptcy two days before. Originally, on cross-examination, she appeared to state that "of course" she had not told Byrd of this. Later, on rebuttal, she said that she had informed Byrd of the filing. Byrd denied knowledge of the filing at this time, and none of the officers recalled Bowens' mentioning the filing. Bowens was much more definite in recounting that she had displayed postcards received from Esther and the letter received from Byrd to the officers and to Byrd as a means of attempting to prove the legitimacy of her presence in the unit.

18. Although she presented most of her testimony in coherent, low-key fashion, Bowens suddenly burst into tears while relating the period that she was in City police custody described in Finding of Fact 16 *supra*. We find that, due to the traumatic effect of this incident upon her, Bowens forgot about her bankruptcy filing or discounted its significance, and failed to mention it or bring it to anyone's attention during the course of events of August 12, 1988.

19. Esther returned from her drug rehabilitation program on or about August 17, 1988. Byrd refused to admit her to the unit, contending that she had vacated or abandoned it. Only after the filing of this proceeding was Esther, with her sister, allowed to return to the unit.

20. When Bowens returned to the unit on or about August 31, 1988, the door was open, a board was removed, and many of her personal possessions were missing from the unit. She submitted a list of items lost, which she valued at $4,195.00. However, we note that the largest entry is $2,600.00 for "all personal items, clothes, shoes, jewelry, son's clothes, toys, toiletries, coats, sheets and blankets." Also, we note that her bankruptcy schedules, filed August 24, 1988, designate $815.00 as the value of all of her household goods, $2,000.00 as the value of all of her "used clothing & jewelry," and place a value of $4,150.00 on her "claims against PHA, et al."

21. Byrd, an elderly, well-spoken, and credible individual who we believe acted bureaucratically but not out of any malice against either Bowens or Esther, contended that he had properly exercised his discretion as a manager in this course of affairs. When asked why the actions against both Esther and Bowens were taken so quickly despite the testimony of Kern in the *Adams* case that there was usually a six-month delay between identifying a "squatter" and forcible eviction of same, Byrd simply stated that his experience differed from that of Kern.

22. In addition to Byrd, Cecily Banks, the PHA's Director of Housing Management, testified on behalf of the PHA. She implicitly supported the actions of Byrd, although her testimony was confined to describing the PHA's general policy regarding remainders, which can be distilled as follows:

a. The PHA recognizes the right of remainders to stay in units after heads of household have been relocated.

b. However, anyone who is not listed on the unit's lease or the last annual CO completed by the head of the household is not considered to be a remainder, although apparently there is some additional discretion, not clarified by a written policy or "single standard," allowed to a manager to consider a person not meeting this definition as a remainder.

c. Any person who is not determined by the manager to be a remainder is considered to be a "squatter," irrespective of whether that person colorably is a remainder or whether the PHA has knowledge of that person's claim to be a remainder.

d. A "squatter" is not considered to have any rights and will be forcibly evicted, by PHA's own police, with assistance from City police if resistance is offered, without any right to a grievance hearing or a court hearing, upon twenty-four (24) hours written notice to vacate the premises.

e. The PHA's internal procedure for dealing with squatters is not in writing and is not communicated to tenants or remainders in either the lease or in any tenant's manual or other written submission to these parties.

## D. CONCLUSIONS OF LAW/DISCUSSION

### 1. THE ADVERSARY PROCEEDINGS ARE CORE MATTERS, WHICH WE CAN AND WILL DETERMINE

 PHA's motion for relief from the stay against Adams is incontestably a "core" proceeding, 28 U.S.C. § 157(b)(2)(G). However, with respect to both of the adversary proceedings, the respective Debtor-plaintiffs totally failed to comply with B.Rule 7008(a), requiring that an adversary complaint "contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge." On their part, the PHA never appears to notice this violation of the B.Rules, never raises any question as to jurisdiction or this court's power to determine this proceeding, and appears to assume that this bankruptcy court will determine it. However, the parties clearly cannot confer jurisdiction upon the court by agreement, see, e.g., In re Almarc Corp., Unified Data Systems, Inc. v. Almarc Corp., 94 B.R. 361, 364 (Bankr. E.D.Pa.1988), and they similarly cannot do so by mere inattentiveness to the rules of the court. See B.Rule 7012(b).

 In Taylor, supra, Judge Fox, addressing the issue of jurisdiction in another "remainder proceeding," stated as follows, slip op. at 5 n. 3:

I have the jurisdiction to resolves these disputes because: they involve a determination regarding the extent of property of the estate; they concern a claim brought by the debtor against third parties; they concern a request for relief from the automatic stay; and their outcome may affect the ability of the debtor to formulate a plan of reorganization. 28 U.S.C. §§ 257, 1334. See, Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir.1984).

This appears to constitute a classification of the matters considered there as core, pursuant to, possibly, 28 U.S.C. §§ 157(b)(2)(A), (C), (E), or (G). We believe that 28 U.S.C. § 157(b)(2)(M), rendering "orders approving the use or lease of property" by the debtor a core proceeding is also pertinent. We therefore conclude that, irrespective of the parties' failure to properly present the issue, these proceedings are indeed "core proceedings" which we can and will determine.

### 2. THE PHA'S ARTICULATED PROCEDURES FOR DEALING WITH REMAINDERS VIOLATE DUE PROCESS OF LAW

We accept, as highly credible, the testimony of Banks, PHA's Director of Housing Management, describing PHA's procedures (she expressly refused to characterize same as a "policy") for dealing with remainders. The actions of the managers involved in the respective cases, Kern and Byrd, were in no respect inconsistent with these procedures. The difficulty with these procedures is that we believe that they violate both the general precepts of due process of law, as applied to any residents of public housing, and the distillation of these rights into the grievance procedures and requirements to which all public housing residents are entitled pursuant to 24 C.F.R. §§ 966.-50 et seq., and to which PHA tenants are entitled under the Consent Decree entered in our district court in Brown v. PHA, C.A. No. 72–1083 (E.D.Pa. June 14, 1974).

 It cannot be gainsaid that all parties who are tenants of public housing are entitled to a full measure of due process before they may be evicted from their premises. See, e.g., Escalera v. New York City Hous-

*ing Authority,* 425 F.2d 853, 861–64 (2d Cir.), *cert. denied,* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970); *Noble v. Bethlehem Housing Authority,* 617 F.Supp. 248, 251 (E.D.Pa.1985); *Staten v. Housing Authority of City of Pittsburgh,* 469 F.Supp. 1013, 1015 (W.D.Pa.1979); and *In re Sudler,* 71 B.R. 780, 786 (Bankr.E.D.Pa.1987).

The skeletal due process rights set forth in these decisions have been fleshed out in federal Regulations, binding upon every public housing authority, as to how evictions are to be carried out. A tenant must be provided with written notice before a housing authority commences evictions proceedings and be advised therein that the housing authority's grievance procedures can be invoked to contest this proposed action. *See* 24 C.F.R. § 966.4(*l*); *Noble, supra,* 617 F.Supp. at 251–52; and *Staten, supra,* 469 F.Supp. at 1015–16. An opportunity to invoke mandatory internal housing authority grievance procedures, as set forth in 24 C.F.R. §§ 966.50, *et seq.,* must be accorded to the evictee. *See Noble, supra,* 617 F.Supp. at 251–52. Then, only after the grievance procedure, if invoked by the evictee, runs its course, may the housing authority proceed to evict the tenant in accordance with state law. *See Noble, supra,* 617 F.Supp. at 252; *Staten, supra,* 469 F.Supp. at 1016; and *McMichael v. Chester Housing Authority,* 325 F.Supp. 147, 149–50 (1971).

Although not entered into the record of these proceedings, we are also aware that the PHA agreed to provide a specific grievance procedure to all tenants in *Brown, supra. See In re Whitt,* 79 B.R. 611, 613 (Bankr.E.D.Pa.1987).

■ The only issue is whether parties who occupy PHA premises under color of claims that they are remainders are properly classifiable as "tenants." Since a remainder *is* a member of a tenant family, entitled to the rights of a tenant, it is no answer to argue that the Adams and Bowens are not entitled to any rights because they are not "tenants" under the ordinary meaning of the term. *Compare Clarenbach v. Giordano,* 11 D. & C.3d 195 (Phila. Co.C.P.1978) (remaining member of a ten-

ant family in private-housing context may not be accorded the rights of a tenant). The question to resolve is whether Adams and Bowens are remainders. Two bases of analysis lead us to the conclusion that parties who allege that they are remainders are entitled to the rights of tenants.

The first line of analysis focuses on the underpinning of the procedural due process requirement, as it has been articulated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In that case, *id.* at 335, 96 S.Ct. at 903, the Court held that the following three elements must be considered to determine whether due process rights attach and whether the particular procedures in effect satisfy those rights in context of a specific fact situation:

first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

In order to apply these prongs of the *Eldridge* test to the PHA's procedures for dealing with remainders, those procedures, as related by Banks, *see* Finding of Fact 22 in *Bowens* situation, pages 844–45 *supra,* must be recalled.

The determination of who is a remainder begins by consultation of the lease and the CO. The reliability of the CO on this point is undermined by several factors. First, it is only completed annually, and does not account for persons who, like Adams and Bowens, arguably become remainders only after the time for completing the CO has passed. Secondly, we doubt that the CO completion process has the reliability in identifying the status of particular persons as, for example, the census, which itself is often criticized for systematic omission of disadvantaged persons. Both Artis and Esther Bowens, who completed the respective COs in issue here, impressed us as individuals totally unaware of the potential

significance of the accuracy of the COs and prone to err in their completion. An error of a head of a household should not be able to impact with finality upon the rights of a third party, *i.e.*, the putative remainder. Thirdly, even had these heads of the respective households been totally attuned to the significance of the COs generally, neither the lease nor any other written material which they were given would have explained to them the significance of the COs in the process of determining who is a remainder. Finally, as Kern indicated in the *Adams* scenario, there is an exception to the normal rule that appearance of the name of a party as a tenant on the lease or CO establishes, *per se*, remainder status if the previous head of the household relocates into public housing. The presence of the 1985 form reciting that Annette Adams could become a remainder and the initial advice by PHA employees to Artis and Adams to the contrary reveals the lack of general knowledge of this exception.[3]

The acknowledged shortcomings of the CO as determinative of who is a remainder lead to the second feature of the process described by Banks, *i.e.*, allowing the project manager to make exceptions. The difficulty with this feature is that the managers apparently receive little, if any, guidance as to how to properly exercise their discretion to make exceptions. The potential differences in reactions of different managers to similar situations are borne out by the contrasting responses of Kern and Byrd to the very similar fact situations in issue here. Except for the fact that

Artis was relocated into public housing, we got the distinct impression that Kern would have allowed Adams to stay in the home, despite the facts that she was not on the CO *and* that the size of the home far exceeded her spacial needs. We also believe that his recitation of a six-month lagtime in effecting a dispossession of any sort of "squatter," even a pure interloper, reflected a humanitarian concern which rose above bureaucratic concerns. Of course, Adams tempered Kern's response to her situation by being an untroublesome tenant, albeit that she never reported her presence in the home until her eviction was eminent and Kern never accepted any rent from her. Meanwhile, Byrd, perhaps due to his generally greater attention to bureaucratic concerns and perhaps because his humanitarianism was frayed by the apparent drug-related activity in the Bowens household, took the fastest action he could to evict Bowens, even though he was well-aware of her presence and even though he had accepted rents from her.[4]

The consequences of a managerial decision on this point, however arbitrary, are substantial. The alleged remainder denied the status of a "true" remainder by a project manager is branded a squatter and treated like one. Upon twenty-four hours notice, the alleged remainder can then be evicted by the PHA's *own* police force, backed up by the unquestionably supportive authority of the police force of the City of Philadelphia, the full power of which was visited upon even such an unthreatening figure as the petite Bowens.

---

3. Frankly, the purposes for this exception articulated by Kern, *i.e.*, keeping families together and avoiding circumvention of admission requirements, are nonsensical. It does not preserve family harmony to require that a disabled, elderly family member must either forego relocation to a unit better able to serve that tenant's needs or see the other members of the family evicted. Circumvention of the normal PHA admission policies may be a legitimate concern. However, there is no basis for a greater concern on this point than otherwise just because the former tenant is moving into public housing.

4. The desire to rid his project of drug-ridden tenants may have also explained his disregard for the rights of Esther Bowens. However, we do not agree with his summary determination

that Esther in any sense abandoned her tenancy. *See, e.g., Noble, supra,* 617 F.Supp. at 249–50, 251 n. 5; *In re Rosemary's, Inc., Roxborough Market Square v. Rosemary's, Inc.,* Bankr. No. 88–12616S, Adv. No. 88–2072S, slip op. at 5–6 (Bankr.E.D.Pa. Nov. 7, 1988) [1988 WL 121140]; *Turnway Corp. v. Soffer,* 461 Pa. 447, 459–60, 336 A.2d 871, 877 (1975); *Girolami v. Peoples Natural Gas Co.,* 365 Pa. 455, 76 A.2d 375, 377–78 (1950); *Aldrich v. Olson,* 12 Wash.App. 665, 531 P.2d 825, 827–28 (1975); 51C C.J.S. 400–01 (1968); 21 P.L.E. 578 (1976); and 1 STERN'S TRICKETT ON THE LAW OF LANDLORD & TENANT, § 283, at 327 (rev. 3d ed. 1973). *But cf. In re West Pine Construction Co.,* 80 B.R. 315 (Bankr.E.D.Pa.1987).

The private interest of the alleged remainders ensnared in this situation is very strong. Public housing is unlikely to be the housing of choice for all but those unable to afford a better environment. The alternative to many residents is immediate homelessness or exposure to a housing market beyond their means and hence ultimate homelessness. Therefore, parties clinging to public housing tenancies are likely to be, as is the case here, needy young women single-handedly parenting children. An erroneous summary and forcible deprivation of shelter to such persons is among the crueler actions against the indefensible that can occur in our society. We believe that such actions, if even *possibly* erroneous, must be prevented.

The risk of an erroneous deprivation of rights is great. The PHA procedures leave far too much discretion in the hands of its managers who, in all fairness to them, have no significant guidance as to what actions are appropriate in a mass of varying factual patterns. The value of the easily-available additional or substitute safeguards of allowing an opportunity for a grievance hearing and mandating a court filing and judgment before allowing the eviction of an alleged remainder are immense. Thus, consideration of the first two elements set forth in *Eldridge* weigh overwhelmingly in favor of alleged remainders such as Adams or Bowens.

There would undoubtedly be a slight additional fiscal and administrative burden upon the PHA if it were required to provide additional or substitute procedural requirements to alleged remainders. However, since at least Kern believes that six months pass before even indisputable squatters are eventually removed in any event, the burden of any administrative delay is not great. Allowing a grievance hearing where alternatives can be presented to alleged remainders could be a mutually-beneficial process. The requirement that court order be obtained before an alleged remainder can be evicted will save the PHA from the great potential civil liability of an erroneous summary eviction and take the potentially-dangerous duty of physically evicting alleged remainders out of the hands of the PHA police and into the exclusive hands of sheriffs and City authorities, where it belongs.

■ Therefore, we believe that the weight of the elements cited by the Supreme Court in *Eldridge* results in a conclusion that due process rights must be accorded to parties who claim, under some color of right, to be remainders, as defined by 24 C.F.R. § 912.2 (definition of "Family").

The second line of analysis requires study of the small body of cases which have heretofore interpreted this section of C.F.R. Only four cases have been identified: *Melton v. New York City Housing Authority*, C.A. No. 79 C 1015 (E.D.N.Y. July 20, 1979) (housing authority required by preliminary injunction to provide grievance procedure and "full due process" before evicting 16–year–old boy and his two half-brothers from housing unit on death of the former leasehold tenant, the boy's mother); *Nash v. Washington*, 360 A.2d 510 (C.D.C.App.1976) (disabled adult male residing in public housing and caring for his disabled sister upon death of the leasehold tenants, his mother and his brother, was entitled to a grievance hearing prior to eviction); *Arsenault v. Chicopee Housing Authority*, 15 Mass.App. 939, 444 N.E.2d 968 (1983) (two-year-old child abandoned to his father by his mother, the leasehold tenant, held entitled to a grievance hearing prior to eviction of him and his father); and *Venango Associates v. Sebrell*, LT: 86–12–02–00162 (Phila.Mun.Ct. April 28, 1987) (woman and son who moved into Section 8 housing unit for the elderly and handicapped to care for leasehold tenant were entitled to remain in the unit upon the death of the tenant).

The first three cases all hold that the issue of whether an alleged remainder is entitled to tenancy status should be resolved in a manner comporting with procedural due process. The fourth is an outright holding, by a landlord-tenant trial court in Philadelphia, that alleged remainders *are* entitled to such status. This last decision confirms our belief that the diffi-

cult decision of who is or is not a remainder can be well-handled by the pertinent state tribunals.

Our particular attention is drawn to the language in *Melton,* where the only other federal court of which we are aware that has addressed this issue concluded, slip op. at 7, citing *Escalera, supra,* as follows:

> our function in the case at bar is not to determine whether the Authority's interpretation of the term "remaining family member", as used in the statute, is correct, but simply to determine whether their procedures for making such determination comport with the requirements of procedural due process.

█ Like the *Melton* court, we no longer believe that we should determine whether any party alleging to be so is, in fact, a remainder. However, we are convinced that, whenever such an issue is raised, procedural due process rights arise on behalf of the alleged remainder. Therefore, we conclude, with all of the other courts that have considered the issue, that alleged remainders are entitled to an opportunity for a grievance hearing and the entry of a court order against them, after notice and litigation of a landlord-tenant possessory action, before they can be evicted. The PHA's process, as articulated by Banks, and as practiced by Kern and Byrd, fails to comport therewith and therefore must be altered before such parties may be evicted.

3. THE CONFIRMATION OF ADAMS' PARTICULAR PLAN, WHILE IT CONSTITUTES A REJECTION OF ANY LEASE AS TO HER ESTATE, DOES NOT FORECLOSE HER FROM ARGUING THAT SHE HAS A VALID LEASE WITH THE PHA.

Having resolved the general legal issue which pervades both of these cases, we now address a "bankruptcy law" issue unique to each. In *Adams,* as we indicated at page 841 *supra,* we confirmed a Plan, on December 8, 1988, which made no mention of Adams' instant differences with the PHA. An issue arises as to what effect, if any, this turn of events causes in the result herein.

Only Adams responded to our invitations to both parties to address the issue of the impact of the confirmation order. She argues unabashedly, that, even though no attempt was made by her to assume any lease she might have with the PHA, either in the Plan or by separate motion, the provision for PHA's rent in her plan and the subsequent confirmation of plan, by reason of 11 U.S.C. § 1327, should bind PHA to a determination that she has a leasehold with the PHA. She also suggests that confirmation of her Plan might impair the rights of the PHA to collect post-petition rentals from her.

█ We agree with Adams' arguments on this issue only insofar as she recites the well-recognized principle that confirmation binds all interested parties to the terms of a plan. *See, e.g., In re Dinh,* 90 B.R. 743, 745 (Bankr.E.D.Pa.1988); *In re Gronski,* 86 B.R. 428, 431–32 (Bankr.E.D.Pa.1988); *In re Bonanno,* 78 B.R. 52, 55–56 (Bankr. E.D.Pa.1987); and *In re Flick,* 14 B.R. 912, 918 (Bankr.E.D.Pa.1981). However, this principle is, in this circumstance, a two-edged sword. We do not agree that, by merely agreeing to pay any rent delinquency to the PHA in her plan and reciting her alleged lease as property of her estate in her Chapter 13 Statement, Adams effectively assumed her alleged lease with the PHA. To the contrary, it is well-established that only by a formal motion to assume an executory contract can same be validly assumed. *See, e.g., In re Whitcomb & Keller Mortgage Co.,* 715 F.2d 375, 378–80 (7th Cir.1983); *In re St. Mary Hospital,* 89 B.R. 503, 507 (Bankr.E.D.Pa. 1988); and *In re Metro Transportation Co.,* 87 B.R. 338, 342 (Bankr.E.D.Pa.1988); and *In re New York City Shoes, Inc.,* 84 B.R. 947, 960 (Bankr.E.D.Pa.1988).

█ Moreover, an executory contract must be assumed "before confirmation" in a Chapter 13 case. 11 U.S.C. § 365(d)(2). The time for the Debtor's assumption of any lease with PHA may well have passed. We have held that the policy of 11 U.S.C. § 525(a) overrides that of 11 U.S.C. § 365(b)(1), and that, therefore, a debtor who is a public-housing tenant may not be

required to pay pre-petition rents as a condition of assuming a lease with a public housing authority. *Sudler, supra,* 71 B.R. at 787. *See also In re University Medical Center, University Medical Center, et al. v. Bowen, et al.,* 93 B.R. 412, 418–19 (Bankr.E.D.Pa.1988); and *St. Mary, supra,* 89 B.R. at 512–13. *Accord, In re Szymecki,* 87 B.R. 14, 16 (Bankr.W.D.Pa.1988). However, we did *not* hold that the presence of § 525(a) eliminates any responsibility on the part of the public housing tenant-debtor who wishes to do so to assume an executory contract in the ordinary fashion.[5]

Clearly, Adams could have filed a timely motion to assume her alleged leasehold with the PHA and, if successful, may have been able to successfully argue that an order allowing lease-assumption, combined with the confirmation order, bound the PHA to recognition of her leasehold. However, she failed to do so. The question then becomes, having failed to do so, is she now precluded, by the confirmation order, from purporting to assume a leasehold interest with the PHA?

We do not believe that the confirmation has this negative effect as to the debtor-tenant of a residential lease. Rather, as we have held in the past, the failure of a tenant to accept a residential lease is merely an abandonment of such a lease to the debtor's estate. *See Sudler, supra,* 71 B.R. at 787; and *In re Adams,* 65 B.R. 646, 648 (Bankr.E.D.Pa.1986). *Accord: Szymecki, supra,* 87 B.R. at 15; and *In re Knight,* 8 B.R. 925, 928–29 (Bankr.D.Md. 1981). *Compare In re Boston Business Machines,* 87 B.R. 867, 872–73 (Bankr.E.D. Pa.1988); and *Adams, supra,* 65 B.R. at 648 (presence of 11 U.S.C. §§ 365(d)(3) and (d)(4) requires that a debtor must assume a non-residential lease or the debtor's rights under the lease will be lost).[6]

Therefore, we believe that Adams' failure to assume any alleged lease with the PHA is not fatal to her attempt to claim a leasehold interest in her home. We thus conclude that the confirmation of Adams' Chapter 13 Plan is a neutral factor which neither diminishes nor enhances her rights vis-a-vis the PHA.

4. THE POST–PETITION ACTIONS OF THE PHA AGAINST BOWENS WERE NOT VIOLATIVE OF § 362(h), SINCE IT IS NOT CLEAR THAT THE PHA HAD KNOWLEDGE OF HER FILING, AND BECAUSE IT RESTORED HER TENANCY WITH REASONABLE PROMPTNESS WHEN THE FILING WAS MADE KNOWN TO IT.

In Finding of Fact No. 18 in reference to Bowens, page 14 *supra,* we concluded that Bowens failed to notify the PHA or the arresting officers of her previous bankruptcy filing during the events of August 12, 1988. We believe that this conclusion is fatal to her claims under 11 U.S.C. § 362(h), which allows for damages to "[a]n individual injured by any willful violation of a stay...." While we believe that a creditor's knowledge of a bankruptcy filing by the debtor is "'the legal equivalent of knowledge of the stay,'" *In re Koresko,* 91 B.R. 689, 701 (Bankr.E.D.Pa.1988); and *Boston Business Machines, supra,* 87 B.R. at 871, both quoting *In re Wagner,* 74 B.R. 898, 904 (Bankr.E.D.Pa.1987), we have also held that an award of damages pursuant to § 362(h) is inappropriate against a party

---

5. As indicated above, Adams also appears to suggest that confirmation of her plan could mollify her obligation to pay post-petition rent. We reject any notion that Adams, through the medium of a plan which fails to make any direct mention of the PHA, could possibly hope to discharge claims of the PHA against her for post-petition rents. While certain post-petition claims may be asserted as administrative claims pursuant to 11 U.S.C. § 503(b)(1)(A), the failure of a potential administrative claimant to assert an administrative claim only renders the claim a non-dischargeable, post-petition obligation. Therefore, Adams clearly is liable to the PHA for all post-petition rentals, irrespective of the confirmation of her Plan.

6. There also might be some question raised as to our jurisdiction to consider this proceeding if the matters in issue and the filing of this proceeding had taken place after confirmation. *See Almarc Corp., supra,* 94 B.R. at 364–65 & n. 4. However, we are not prepared to rule, *sua sponte,* that the confirmation order renders the Adams matters in issue, which were filed and tried prior to confirmation, moot.

who violates the stay while unaware of the bankruptcy filing. *Koresko, supra,* 91 B.R. at 700–01.

We further recognize that, upon becoming aware of the bankruptcy filing and/or the impact of the stay, a party who has acted in violation of the stay without previous knowledge of the debtor's bankruptcy filing is obliged to take any reasonable action to undo a previous, innocent violation of the stay. *University Medical Center, supra,* 93 B.R. at 419; and *Boston Business Machines,* 87 B.R. at 871–72. We have no evidence that the PHA was in fact aware of Bowens' bankruptcy filing until service of the papers in this lawsuit upon it, on or shortly after August 24, 1988. The PHA agreed to restore Bowens to possession of her unit on or before the date that an initial preliminary injunction hearing was scheduled in this proceeding, on August 31, 1988. This reaction appears appropriately prompt to us and we commend the PHA's counsel for this undertaking. We also commend the agreement by PHA's counsel, at the hearing on November 10, 1988, to withdraw all criminal charges against Bowens. Not only was this latter agreement just, but it is, in our mind, sufficient to eliminate any claim of a violation of the stay by PHA on that score.

We therefore reject any claim of Bowens for damages based upon 11 U.S.C. § 362(h).

### 5. BOWENS AND, TO A FAR LESSER EXTENT, ADAMS ARE NEVERTHELESS ENTITLED TO MONETARY DAMAGES AGAINST THE PHA FOR VIOLATIONS OF THEIR RESPECTIVE CIVIL RIGHTS.

Although we have concluded that Bowens is not entitled to monetary damages on the basis of 11 U.S.C. § 362(h), it cannot be forgotten that she was subjected to significant trauma and loss of certain of her household goods and other property as a result of the violation of her rights to, *inter alia,* procedural due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution. It is provided, in the Civil Rights Act of 1871,

42 U.S.C. § 1983, that "[e]very person who, under color of any . . . custom, or usage of any state . . . subjects or causes to be subject, any citizen of the United States . . . to the deprivation of any rights, . . . secured by the Constitution . . ., shall be liable to the party injured in an action at law, . . ."

We have no doubt that Kim Bowens is entitled to damages under this statutory provision. She was physically removed from her residence, without due process of law, on two occasions. In the course of the latter incident, she was subjected to totally unreasonable use of force and was reasonably embarrassed and traumatized thereby.

We also note that the incidents in issue resulted in a loss of at least a portion of Bowens' modest stock of household goods and other personal property. We question whether the value of this property was over $4,000.00, as she claims, because her Schedules reveal that the value of the total property which she owned was less than that. *Cf. Payne v. Wood,* 775 F.2d 202, 204–07 (7th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986) (debtors held to valuation of household goods in Schedules in claiming exemptions as to proceeds from fire insurance). However, we do not doubt that she suffered a real deprivation of much of what little she had. Since she is a welfare recipient, her poverty makes the deprivation more difficult for her to quickly remedy.

The Debtor's Schedules, without explanation, value her claims in her instant adversary proceeding at $4,150.00. The Schedules were prepared, however, before she returned to her premises and discovered the loss of her personalty. We therefore value her total loss at $7,500.00, and we shall award her that sum, subject to a subsequent remittitur.

Adams has made no direct claim for damages. Obviously, she did not undergo the trauma experienced by Bowens. However, her complaint does include a general claim for additional relief. Though not involved, as was Bowens, with drugs or at least persons involved with drugs, her civil

rights were also violated by the attempts of the PHA to deprive her of her residence without due process. She is entitled to at least minimal damages. *Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978). We shall award her damages of $1,000.00, subject to remittitur, as discussed below.

Finally, we note that counsel for both debtors are entitled to reasonable attorney's fees as part of their costs, pursuant to 42 U.S.C. § 1988. This award shall be subject to a limited remittitur as well.

### 6. WHILE BOTH DEBTORS COULD BE SUBJECT TO EVICTION IN PROCEEDINGS HEREINAFTER, WE SHALL REMIT ALL OF THE DAMAGES AWARDED TO THEM UPON THE PHA'S PRESERVATION OF THEIR RESPECTIVE TENANCIES AND THE ALLOWANCE OF FIVE YEARS OF FREE RENTALS TO BOWENS, PROVIDED SHE REMAINS A TENANT IN GOOD STANDING

■ Our foregoing conclusions would allow the PHA to attempt to proceed to evict both Adams and Bowens, assuming that it accorded them the minimal procedural protections to which we deem that they are entitled. In the case of Adams, we will grant the PHA relief from the automatic stay to terminate her possession of her unit, provided that it accords her an opportunity for a grievance hearing, and, thereafter, proceeds against her in a state-court eviction proceeding as we hold is required. On the other hand, relief from the automatic stay merely permits a landlord to proceed according to the remedies available in state court; it does not permit any short-circuiting of the debtor's state-court rights. *See Adams, supra,* 65 B.R. at 649–50. It also must be recalled that even a tenant's naked possessory rights to a premises are protected by the stay and that a leasehold is not terminated until a judgment for possession has been entered and executed upon. *See Sudler,* 71 B.R. at 786 n. 1, 787 n. 1, 785–86.[7]

No relief from the automatic stay has been requested as to Bowens, and therefore none can be provided as to her. The PHA would appear to have a difficult road ahead of it if it would intend to attempt to permanently evict Bowens.

However, we are impressed with the waste of movement which would be indulged in by all involved in the course of further litigation of these matters. We are also impressed with the thought that tenancies with the PHA are all that Adams and Bowens really want and that, in the long run, these are far more valuable to them and their dependents than the monetary damages we have awarded. On the other hand, the PHA is hard-pressed for funds, and its purposes are better served by bartering its housing resources with Adams and Bowens in exchange for saving the payments otherwise required to be made to them. We also believe that the PHA should welcome an opportunity to reduce its liability for attorney's fees to the Debtors' counsel, while the Debtors' counsel should not complain of a remittitur of attorney's fees which works to the permanent benefit of their clients.

We shall therefore order, similar to our directives in *Boston Business Machines, supra,* 87 B.R. at 873–74, that all of the monetary damages which we have heretofore awarded to Adams and Bowens will be remitted and the attorneys' fees to the Debtors' counsel capped at $5,000.00 for both matters if the PHA does the following:

1. Offers Adams a suitable unit which is the appropriate size for her family and relocates her at no cost to her. We observe that her presence in the home in issue appears to us to be a waste of scarce four-bedroom units, and the PHA would be

---

7. This result is consistent with that reached in *In re Borbridge & DeSantis,* 66 B.R. 998, 1002–03 (Bankr.E.D.Pa.1986). *See also In re Telephonics, Inc.,* 85 B.R. 312, 316 (Bankr.E.D.Pa.1988). To the extent that *In re McGovern Auto Special-* ty, Inc., 40 B.R. 521, 522–23 (Bankr.E.D.Pa. 1984), could be read to hold that mere dispatch of notices may terminate a tenancy, we decline to follow it.

reasonable in requesting that she relocate therefrom to a smaller unit.

2. Allows Bowens to remain in her present unit, as head of a household which can include her sister Esther, rent-free, for a period of five years, provided that she remains a tenant in good standing and is not evicted for cause. The caveat of "good behavior" on the part of Bowens is underscored because we share Byrd's concern that Walker is an undesirable drug-related influence (on, perhaps, Bowens' son, among others) whose presence in the unit, on even a "visiting" basis, could possible merit her eviction on the basis of paragraph seven of the Dwelling Lease form, authorizing eviction for a tenant's "serious interference with the rights of other tenants."

Also, as in *Boston Business Machines, supra,* 87 B.R. at 873–74, we shall create an additional incentive for the PHA to accept this resolution by not allowing the PHA to obtain relief from the stay against either Debtor unless and until it pays the monetary relief to both Debtors to which they are deemed otherwise entitled. Even moreso than the business debtor in that case, we believe that it would impose a considerable hardship upon the Debtors here to relocate. They will need money up front if they are obliged to move.

E. CONCLUSION

An Order consistent with the foregoing Opinion will be entered.

ORDER

AND NOW, this 9th day of January, 1989, after a consolidated hearing of October 13, 1988, on the Motion of PHILADELPHIA HOUSING AUTHORITY (hereinafter referred to as "PHA") for relief from the automatic stay in the main case and the above adversary proceeding in the *Adams* matters, and after a trial of November 10, 1988, in the *Bowens* matter, and upon consideration of the various post-trial submissions of the parties, it is hereby ORDERED AND DECREED as follows:

1. The PHA's motion for relief in the *Adams* matter is GRANTED subject to the terms of paragraph six *infra.*

2. Judgment is entered in part in favor of the Debtor–Plaintiffs, VERA ADAMS (hereinafter "Adams") and KIM BOWENS (hereinafter "Bowens"), and against the PHA only in both of the adversary proceedings in issue.

3. The PHA's procedures and/or policies of evicting parties who are colorably remaining members of tenant families from premises without first providing them with a prior notice and opportunity for a grievance hearing and without first commencing and obtaining a judgment in a state-court landlord-tenant proceeding which grants them possession of the said premises is declared violative of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the applicable federal Regulations appearing at 24 C.F.R. §§ 966.4(*l*) and 966.50, *et seq.* All other claims of the Debtor–Plaintiffs against PHA are DENIED.

4. Adams is awarded monetary damages of $1,000.00 and Bowens is awarded monetary damages of $7,500.00, pursuant to 42 U.S.C. § 1983, against the PHA only, subject to the terms of paragraph six *infra.*

5. The Debtors' counsel, Community Legal Services, Inc. (hereinafter "CLS"), is awarded reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, against the PHA only, subject to the terms of paragraph six *infra.*

6. However, if PHA agrees to do the following in writing, copy to the Debtors' counsel and the court, on or before January 31, 1989, then all monetary damages awarded to the Debtors shall be remitted entirely and the attorney's fees of CLS shall be remitted to $5,000.00:

 a. Offers Adams a suitable public housing unit of sufficient size for her family, and relocates her at no cost to her.

 b. Allows Bowens and her sister Esther to remain in a unit of which either of them is head of the household, rent-free, for a period of five (5) years, provided that Bowens remains as a tenant in good standing.

c. Pays the $5,000.00 to CLS.

7. If the PHA does not accept the terms set forth in paragraph six *supra*, the PHA may be granted relief from the automatic stay as to either Adams or Bowens only after payment of the monetary damages set forth in paragraph four to both of them.

8. If the PHA does not accept the terms set forth in paragraph six, CLS is permitted to file an Application of reasonable attorney's fees and costs, including compensation in connection with its application, on or before February 13, 1989, in procedural conformity with *In re Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa.1987).