In re Elijah BELL, Debtor.

Elijah BELL, Plaintiff,

v.

PHILADELPHIA HOUSING AUTHORITY and James J. O'Connell, U.S. Trustee, and Edward Sparkman, Trustee, and Marilyn Lowney and Gregory Kern, Executive Director and E.R. Wingate, Defendants.

Bankruptcy No. 89–10331S.
Adv. No. 89–0048S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 10, 1989.

Michael Donahue, Community Legal Services, Inc., Philadelphia, Pa., for plaintiff/debtor.

James J. O'Connell, Ass't. U.S. Trustee, Philadelphia, Pa., defendant, U.S. Trustee.

Terri W. Claybrook, Philadelphia Housing Authority, Philadelphia, Pa., for defendant/Philadelphia Housing Authority.

Edward Sparkman, Philadelphia, Pa., defendant, standing Chapter 13 trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant adversary proceeding, reminiscent of two proceedings that we recently decided together in *In re Adams, Adams v. Philadelphia Housing Authority*, and *In re Bowens, Bowens v. Philadelphia Housing Authority*, 94 B.R. 838 (Bankr.E.D.Pa. 1989) (hereinafter cited as *"Adams"*), raises the issue of whether the Philadelphia Housing Authority (hereinafter referred to as "PHA") deprived a debtor-tenant of due process in an eviction proceeding. In issue here is the utilization of a judgment, entered by agreement in 1985 on the basis of rent delinquencies existing at that time, as a means to evict the tenant in 1989 for post-judgment rent delinquencies.

We find that the procedures utilized by the PHA here conflict with the requirements that a tenant must (1) receive prior notice of the particular lease violation which may result in the eviction; (2) be advised of an opportunity for a grievance hearing as to that violation; and (3) thereafter, be subject to a court judgment as to the particular violation, before the tenant may be evicted. We also find that these requirements cannot be waived. Further, we question whether a special Philadelphia Municipal Court (hereinafter "PMC") policy for handling only PHA evictions, which is an unwritten exception to the duly-adopted PMC Rules of Civil Procedure (hereinafter "PMCRCP"), deprives PHA tenants of due process. Therefore, as in *Adams*, we find a violation of due process and the pertinent federal Regulations pertaining to evictions to be present, and we are obliged to restore the Debtor, with certain conditions attached, to public housing tenancy.

### B. PROCEDURAL HISTORY

The Chapter 13 bankruptcy case and the instant adversary proceeding were filed by the Debtor, ELIJAH BELL, simultaneously on January 26, 1989. At the time of these filings, the Debtor also filed a motion for a preliminary injunction, seeking to immediately recover possession of a scattered-site PHA house at 6014 West Summer Street, Philadelphia, PA 19139 (hereinafter "the Premises") from which he had been evicted the day before, January 25, 1989. We scheduled a hearing on the motion on Friday, January 27, 1989, at 2:00 P.M.

After conducting a rather rushed hearing at the indicated date and time, we orally indicated an intention to grant only limited provisional relief to the Debtor. As memorialized in an Order of January 30, 1989, we directed that the PHA immediately cooperate fully in returning the Debtor's personal property removed from the Premises. However, as the debtor had obtained emergency shelter at no cost through March 30, 1989, and we were disinclined to find that his probability of success to obtaining restoration of a PHA tenancy was certain, we denied other relief at this time. We did, however, expedite the disposition of the matter by scheduling a final hearing on February 16, 1989, and directed the parties to file Briefs supporting their respective positions in the interim, on or before February 10, 1989.

On February 16, 1989, having incorporated the substantial record received at the hearing on January 27, 1989, *see* Bankruptcy Rule (hereinafter "B.Rule") 7065 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 65(a)(2), we took brief additional testimony. At the close of that hearing, we indicated an intention to issue an Order ultimately entered on February 17, 1989, directing the storage company which had the Debtor's personalty, as well as the PHA, to release same to him forthwith without any charges. We denied a

request by the PHA to admit into the record an Affidavit of Richard Simpson (hereinafter "Simpson"), Deputy Court Administrator of the PMC. This Affidavit and exhibits thereto, attached to its Brief, constituted almost the entire PHA submission on February 10, 1989. This ruling prompted the PHA to request that we keep the record open to receive direct testimony from Simpson. We granted this request, and received extensive testimony from Simpson on February 21, 1989.

The matter is now ripe for decision. Pursuant to B.Rule 7052 and F.R.Civ.P. 52(a), we present the said decision in the required form of Findings of Fact, followed by Conclusions of Law which are headnotes to a Discussion of each relevant point of law.

## C. FINDINGS OF FACT

1. The Debtor is a 69–year–old man, separated from his wife, who had resided in the Premises since 1961, and was, at the time of his eviction, its only resident. The only other regular occupants are his son, who is presently a student at Pennsylvania State University and resides in the Premises only during school breaks; and his uncle, who stays there periodically. The Debtor, whose sole source of income is social security benefits of $478.00 monthly, appeared to be adversely afflicted both physically and mentally by age. While his recitations were subjectively credible, he appeared to be disorganized and not a totally reliable historian.

2. In 1985, the Debtor became in arrears in his rent to PHA, then ranging between $156.00 and $171.00 monthly. Consequently, the PHA filed a Landlord & Tenant Complaint in PMC on January 22, 1985, at LT–85–1–22–1611. Therein, possession of the Premises was sought, per the Complaint form, on the basis of item "A," i.e., non-payment of rent, in the amount of $561.00; and item "B," i.e., "termination of the term which ended on," after which is typed in "termination of lease."

3. The PHA Complaint in the PMC was resolved on March 6, 1985. At that time, the Debtor was represented by Peter D. Schneider, Esquire (hereinafter "Schneid-

er"), of Community Legal Services, Inc. (hereinafter "CLS"), the legal program providing free legal services to indigent persons in civil matters, which program also represented the Debtor in this proceeding. The resolution was effected by the execution of a form "Landlord Tenant Agreement." In that Agreement, the Debtor agreed to entry of a judgment for possession and back rent of $644.00. The parties further agreed, per paragraphs 4 and 5 of the form, as follows:

4. Plaintiff PHA agrees not to proceed with the eviction as long as:

a. Defendant [Debtor] pays the sum of $200.00 on or before 4–8–85 to Plaintiff PHA and,

b. Defendant pays the current rent due each month thereafter, plus $50.00 per months on the balance due (delinquent rent) to Plaintiff PHA, beginning in May, 1985.

5. *Defendant tenant hereby waives the Philadelphia Municipal Court six (6) month rule in reference to evictions, and agrees that PHA may evict at anytime during the next five years if this agreement is broken and the rent due is not paid* (emphasis added).

It does not appear that this Agreement was approved by a judge of the PMC.

4. Thereafter, the Debtor made his regular rent payments to PHA in sporadic fashion (about half of the payments due were remitted) throughout the period from 1985 to 1988. At no time did the Debtor pay the extra $50.00 monthly and, by November, 1988, he had amassed a rent delinquency, according to the PHA, in excess of $3,300.00.

5. Although the Debtor claimed, in less than totally coherent fashion, that his present rent of $200.00 monthly was calculated excessively in light of his income, and that the Premises developed certain defects which justified rent abatements, none of these claims were successfully developed, and we therefore assume that the PHA's rent claims were accurate.

6. In September, 1988, Edward R. Wingate (hereinafter "Wingate"), the assistant manager of PHA's scattered-site program, visited the Debtor at his home to attempt

to resolve the problem of his "astronomical" rent balance. In this meeting, Wingate explained to the Debtor that he would most likely be entitled to certain rebates from the gas and electric suppliers to the units, which could be offset against his rent bill. He requested the Debtor to sign "release forms" to allow these rebates to be paid to the PHA as credit on his bill, which the Debtor proceeded to do.

7. Wingate's recollections of the specifics of his conversation with the Debtor were hazy. He conceded that he did not indicate to the Debtor that the PHA was planning to initiate eviction proceedings against him.

8. The PHA records indicate that, on November 3, 1988, apparently pursuant to one of the "release forms," a gas rebate of $1,005.00 was received by the PHA and deducted from the Debtor's account.

9. Wingate testified that, after this meeting, he left several notes for the Debtor at the Premises, a copy of only one of which was produced and which read as follows: "YOUR P.H.A. MANAGER WAS HERE TO SEE YOU. PLEASE CONTACT ME AT THE FOLLOWING NUMBERS: (1) 978–1104 OR (2) 978–1100. Prior to going to Court Please contact me between 2:00 & 4:30 o'clock. THANK YOU, E.R. Wingate."

10. When this and apparently other notes were unanswered, Wingate or some other PHA employee, without notifying the Debtor, apparently initiated proceedings in the PMC to evict the Debtor for failing to adhere to the terms of the Landlord Tenant Agreement of March 6, 1985.

11. As explained by Simpson, PMCRCP 126d provides that "[a]n alias writ of possession may not be issued after six (6) months from the date of the judgment without leave of court." However, Simpson further stated that an unwritten policy of the PMC, which the Board of Judges expressly refused to add to the Rule despite a written proposal by Simpson to do so, allows only the PHA to have an alias writ issued for five (5) years after a judgment of possession without leave of court, instead of within six (6) months, as per PMCRCP 126d.

12. Simpson stated that the procedure of the PMC regarding any alleged breach of a Landlord Tenant Agreement, also not set forth in the PMCRCP, is as follows:

a. No proceedings to enforce Agreements are entertained unless and until the landlord files an Affidavit indicating the specifics of an alleged default of an Agreement with the PMC.

b. If the judgment is obtained on the basis of only item "A" on the Complaint form, i.e., non-payment of rent, and the tenant has paid a sum equal to or more than the amount adjudicated due subsequent to the agreement, the landlord is required to file a new Landlord & Tenant Complaint to obtain possession or the premises, even if the tenant is allegedly delinquent on post-Agreement rent.

c. However, if the tenant has allegedly violated an Agreement and has not paid a sum equal to the amount adjudicated due in the judgment, or if the judgment is exclusively or alternatively obtained on the basis of item "B" on the Complaint form, i.e., termination of the lease term, or item "C" on the Complaint form, i.e., breach of lease condition other than non-payment of rent, then the PMC adheres to the following (again unwritten) procedure:

(1) A letter is sent by regular mail to the tenant advising that an Affidavit that the Agreement was broken has been filed, which may result in eviction, and that, if the tenant "disagrees" with the affidavit (which is not itself sent to the tenant), the tenant should "report to Room 1216, City Hall Annex within five (5) working days of service of these papers."

(2) If no response is received to this letter in the specific time-period, the landlord is permitted to obtain the issuance of a writ alias for possession of the premises and may evict the tenant. The only notice that the tenant will receive thereafter, prior to physical eviction, is a copy of the writ of possession, issued on behalf of the landlord seeking issuance of the writ alias for possession.

(3) If a response to the letter is received by the PMC from the tenant, in any form, the matter is set down for a hearing before the court prior to the issuance of a writ alias for possession.

13. In the instant case, the PHA filed an Affidavit of default of the Agreement in the PMC at some indeterminate date, alleging that the Debtor "failed to pay rent plus arrears in Feb. Mar. Apr. May, 1988."

14. Since item "B" was checked on the Landlord & Tenant Complaint in the case in issue, a letter, pursuant to Finding of Fact 12(c)(1) *supra*, was sent, on November 30, 1988, to "Elizah [sic] & Wilhelmena [the Debtor's estranged wife] Bell" 6012 ("4" written over "2") Summer St., Scattered Sites, Phila., PA 19139." In addition, the PHA also filed a Praecipe for Writ of Possession in the case, stating merely "Issue writ of possession" of the premises in issue, on November 30, 1988, which was approved by the court and was to be served on the Debtor.

15. The Debtor testified that he received a copy of the writ of possession, but did not receive a copy of the letter from the PMC. Therefore, he never contacted the PMC. Nor did he contact his CLS counsel. Instead, upon receipt of the writ, he went to the PHA office to see Wingate concerning the apparent agreement he had made with Wingate. Unable to see Wingate, the Debtor showed "the bills and the paper and all that stuff" to an unidentified woman in the PHA office. The Debtor understood this woman to tell him that, after the gas and electric rebates were credited to his account, he would owe $600.00 to bring his account current.

16. PHA records verify that, on December 13, 1988, the Debtor paid $600.00 to PHA, supporting his testimony that he remitted this sum to the PHA pursuant to his discussions with the unidentified woman in the PHA office.

17. The Debtor's counsel contended that an electric-company rebate of about $1,400.00 was forthcoming, which would have been credited to the PHA pursuant to the other "release form" executed by the Debtor. The deduction of the $1,005.00 gas rebate, the $600.00 payment, and the $1,400.00 prospective electric rebate would still leave a rent balance due, as of January, 1989, of $748.00, according to PHA records. It should be noted that, except for the $600.00 payment, the Debtor made no remittance of any amount to the PHA, including his regular rent of $200.00 monthly, since August, 1988.

18. On January 25, 1989, without the PHA's providing any notice of any kind to the Debtor subsequent to his payment of $600.00 to it in December, 1988, the Debtor was physically evicted from the Premises pursuant to the issuance of an alias writ of possession as a result of the Praecipe of the PHA to issue same dated January 3, 1989.

19. The Debtor is presently residing in an apartment in the vicinity of 48th Street and Baltimore Avenue at the cost of some undesignated governmental agency, through March 30, 1989.

## D. CONCLUSIONS OF LAW/DISCUSSION

1. This Court Has Jurisdiction Over this Proceeding and May Determine it, Since it is a Core Proceeding.

The Complaint sets forth claims pursuant to 11 U.S.C. §§ 542, 543, and 547, which it is further alleged that the Debtor may invoke pursuant to 11 U.S.C. §§ 522(g)(1), (h). No averment is included, as is required by B.Rule 7008(a), as to whether or not this is contended to be a core proceeding.

■ The PHA denied all of the jurisdictional averments, apparently due to a contention articulated by its counsel, at the January 27, 1989, hearing, that the completion of the eviction of the Debtor terminated his lease and deprived this court of power to reinstate him to residency in the Premises. *See, e.g., In re Sudler,* 71 B.R. 780, 785 (Bankr.E.D.Pa.1987); and *In re Mason,* 69 B.R. 876, 881 (Bankr.E.D.Pa. 1987). However, following *In re Morales,* 45 B.R. 314 (Bankr.E.D.Pa.), *aff'd,* C.A. No. 85–1159 (E.D.Pa. April 25, 1985), we conclude that, where it may be established that a tenant is wrongfully dispossessed prior to a bankruptcy filing, the bankruptcy court does have jurisdiction of a pro-

ceeding to recover possession of a leasehold of which the debtor-tenant was allegedly wrongfully deprived pre-petition.

While the Debtor did not undertake to establish the elements of 11 U.S.C. § 547,[1] it appears that this proceeding is, indeed, properly maintained to obtain turnover of specific property belonging to his estate pursuant to 11 U.S.C. § 542(a). *See generally In re Koresko,* 91 B.R. 689, 694–97 (Bankr.E.D.Pa.1988). It also seems clear that the Debtor is empowered to invoke § 522(g)(1), as the "transfer" of his leasehold was not voluntary and the Premises was not concealed by the Debtor. *See In re Aikens, Aikens v. City of Philadelphia,* 94 B.R. 869, 872–73 (Bankr.E.D.Pa.1989); and *Mason, supra,* 69 B.R. at 881–82.

We therefore conclude that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E). *Compare In re Windsor Communications Group, Inc.,* 67 B.R. 692, 697–98 (Bankr.E.D.Pa.1986) (accounts receivable action seeking monetary relief instead of recovery of specific property may even be a core proceeding under 28 U.S.C. § 157(b)(2)(E)). Furthermore, alternative bases to classify this matter as core may arise from 28 U.S.C. §§ 157(b)(2)(A), (M), or (O). *Compare Adams, supra,* 94 B.R. at 845–846.

We therefore conclude that we not only have jurisdiction over this proceeding, but that it is a core proceeding which we can finally determine. *See* 28 U.S.C. § 157(b)(1).

2. We Are Not Convinced By the Debtor's Contentions That We Can Rule in His Favor on the Alternative Grounds That the Parties Entered into a Novation; That the PHA Waived the Debtor's Breaches of the 1985 Agreement and should be Estopped from Enforcing it; or That the Debtor "Satisfied" the 1985 Agreement.

In his Brief filed on February 10, 1989, the Debtor advances several arguments which failed to convince us that they supported the Debtor's contention that we should revive the Debtor's right to a PHA leasehold.

The first contention is that, either in his discussions with Wingate in September, 1988; or in his discussions with the unidentified woman at the PHA in December, 1988; or, considering both together, the parties effected a novation which extinguished PHA's rights under the March 6, 1985, Agreement. We do not agree. In order to establish a novation, *inter alia,* "the plaintiff has the burden of proving that the parties intended to discharge the earlier contract." *Publicker Industries, Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1071 (3d Cir.1979). *Accord, United States to Use of Par–Lock Appliers of N.J., Inc. v. J.A.J. Constr. Co.,* 137 F.2d 584, 587 (3d Cir.1943); *In re Yoder* 48 B.R. 744, 748 (W.D.Pa.1984); and *First Pennsylvania Bank v. Triester,* 251 P.A.Super. 372, 381–84, 380 A.2d 826, 830–32 (1977). The recitations of both the Debtor and Wingate regarding any specific agreements made in their conversation are extremely vague. The Debtor is not much clearer in relating his dealings with the unidentified woman in the PHA office. It is questionable whether the Debtor has met his burden of proving any specific agreement whatsoever regarding his future tenancy in these encounters. However, nowhere does he so much as allege that, in any of these discussions, the 1985 Agreement even came up, let alone allege that the PHA parties to any of these discussions ever agreed to discharge the 1985 Agreement in exchange for the Debtor's promise to pay the $600.00 and remit his utility rebates to the PHA.

The second argument appears driven by two separate rather vaguely-advanced contentions: (1) that, by failing to enforce the 1985 Agreement for over three

---

**1.** The Debtor apparently contended that the $600.00 payment (and possibly the crediting to it of the utility rebates), were preferential payments. *See In re Richardson,* 94 B.R. 56 (Bankr. E.D.Pa.1988); and *Mason, supra.* In our discussion at page 219 *infra,* we dispose of the Debtor's potential claim to recover rentals and rebates obtained by PHA in the preference period.

years, the PHA waived its right to do so; and (2) having recently received the gas rebate and the $600.00 payment and having agreed to accept the electric rebate only shortly before the Debtor's eviction, the PHA should have been estopped from enforcing the Agreement and evicting the Debtor at that time. The waiver argument is very difficult to sustain. It is clear that merely failing to strictly enforce an agreement from the outset does not in itself constitute a later waiver of strict enforcement of its terms. *See Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 285–87, 199 A. 139, 142 (1938); and *Matevish v. Ramey Borough School District,* 167 Pa.Super. 313, 319–20, 74 A.2d 797, 801 (1950). It is not at all clear that the Debtor changed his position to his detriment in reliance of the fact that PHA failed to strictly enforce the 1985 Agreement, as the court, in *Warren,* suggests is necessary to successfully advance such an argument. 330 Pa. at 285–87, 199 A. at 142. The Debtor simply failed to make the payments under the 1985 Agreement, or even to make his regular rental payments, for reasons he never undertook to explain. There is no suggestion on his part that the PHA's failure to enforce the Agreement motivated his actions.

■ Somewhat more appealing is an apparent contention that the Debtor changed his position to his detriment, *i.e.,* he paid at least $600.00, in reliance upon the PHA's willingness, coupled with his cooperation in allowing the PHA to recover his rebates, to allow him to remain a tenant. However, the theory of equitable estoppel which is articulated in such contentions is difficult to maintain in any factual setting. Equitable estoppel can be successfully invoked only where there is clear proof that the party sought to be estopped has acted or failed to act in a manner which it knew or should have known would be relied upon by the party seeking to invoke estoppel to the latter's detriment. *See, e.g., Schifalacqua v. CNA Insurance,* 567 F.2d 1255, 1258 (3d Cir.1977); *GAF Corp. v. Amchem Products, Inc.,* 399 F.Supp. 647, 657–59 (E.D.Pa.1975), *rev'd on other grounds,* 570 F.2d 457 (3d Cir.1978); and *In re Franks,* 95 B.R. 346, 353–54 (Bankr.E.D.Pa.1989).

In addition, reasonable reliance on the representations made and a change of position on the part of the party seeking to invoke estoppel must be established. Here, there is no evidence that the Debtor dramatically changed his position as a result of reliance on his discussions with PHA personnel. He paid $600.00, but this sum was merely the equivalent of rent otherwise due (and unpaid since August, 1988), for November and December, 1988, and January, 1989. There is no evidence that he could have or would have received the utility rebates as direct cash payments if he had not released his right to receive them to the PHA. Therefore, he may not have been giving up anything of real value to him in signing the "release forms." Most problematically, evidence that either Wingate or the woman in the PHA office meant to mislead him or should have suspected that they did so regarding the status of the 1985 Agreement is not provided. It was not established that either of these parties even mentioned that Agreement when they spoke with the Debtor.

Finally, the Debtor argues that paragraph 5 of the Agreement, *see* Finding of Fact 3, page 210 *supra,* should be read, construing ambiguities against the PHA, which drafted it, to only continue until the Debtor paid off the sum of $644.00 recited in the Agreement, and not thereafter. This contention is supported by Schneider's testimony that this was *his* understanding of the Agreement. In one sense, the Agreement is ambiguous. It is not clear that, if the Debtor paid off the entire sum of $644.00, strictly according to the terms of the Agreement, the sword of the judgment should be held over his head for up to five years thereafter. We would be disinclined to so read it.

However, here, the Debtor broke the terms of the Agreement immediately after it was made, and never made any attempts to cure his default. The "rent due" under the Agreement is the $200.00 lump-sum payment, which *was* made, and payments of current rent plus $50.00 monthly on the balance due, which were *not* ever made. We certainly do not think that the Debtor

was in any way misled, or acted differently in reliance of some misunderstanding of the meaning of the Agreement, in failing to make his post-Agreement payments. The Debtor knew that he had to pay his regular rent, plus $50.00 monthly toward the delinquency, and simply failed to do so, for reasons unexplained by him. Therefore, he violated the Agreement and, by its terms, placed himself in jeopardy of an eviction on the basis of the judgment agreed to thereby for five years.

In all probability, the Debtor was truthful when he testified that he never noticed paragraph 5 of the Agreement, had no subjective awareness of its contents, and never dreamed that it bore possible relevance to his 1988–89 rent delinquency. However, he was represented by competent counsel totally conversant with the wording and meaning of the Agreement. We cannot and will not assume that counsel failed to explain its ramifications to him. Rather, given our observation of the Debtor, it is highly likely that explanations were given to him by counsel at the time, which he now simply does not recall.

We therefore reject the Debtor's arguments that creation of a novation, waiver, estoppel, or performance of what he reasonably believed to be his undertaking in the 1985 Agreement are viable theories upon which the Debtor is entitled to relief.

3. The Debtor's Contention That His Due Process and Other Federal Rights Were Violated by the Course of the Termination of His PHA Tenancy is Meritorious.

We are left with the Debtor's contention that the procedures utilized by the PHA in the termination of his tenancy violated the Debtor's rights to due process of law and other rights to which he is accorded by federal Regulations applicable to public-housing tenants. In *Adams,* we carefully considered the parameters of these rights, and concluded that the PHA's policy of summarily evicting alleged remaining members of tenant families, as described by its own Director of Housing Management, deprived the debtor alleged tenants of these

rights. 94 B.R. at 845–49. Here, we have a record describing the PMC procedures provided by the completely disinterested, extensive, and extremely enlightening testimony of Simpson. We have no doubt whatsoever that the PMC procedures operate precisely in the manner that they were described by Simpson. We conclude that, in general, these procedures are of doubtful legality and that, as applied to the Debtor, his due process and other federal rights were unquestionably violated by operation of those procedures.

The basic underpinnings of the rights of public housing tenants in instances where a public housing authority seeks to terminate their lease and evict them are set forth in *Adams, supra,* at 845–46, as follows:

It cannot be gainsaid that all parties who are tenants of public housing are entitled to a full measure of due process before they may be evicted from their premises. *See, e.g., Escalera v. New York City Housing Authority,* 425 F.2d 853, 861–64 (2d Cir.), *cert. denied,* 400 U.S. 853 [91 S.Ct. 54, 27 L.Ed.2d 91] (1970); *Noble v. Bethlehem Housing Authority,* 617 F.Supp. 248, 251 (E.D.Pa. 1985); *Staten v. Housing Authority of City of Pittsburgh,* 469 F.Supp. 1013, 1015 (W.D.Pa.1979); and *In re Sudler,* 71 B.R. 780, 786 (Bankr.E.D.Pa.1987).

The skeletal due process rights set forth in these decisions have been fleshed out in federal Regulations, binding upon every public housing authority, as to how evictions are to be carried out. A tenant must be provided with written notice before a housing authority commenced evictions proceedings and be advised therein that the housing authority's grievance procedures can be invoked to contest this proposed action. *See* 24 C.F.R. § 966.4(*1*); *Noble, supra,* 617 F.Supp. at 251–52; and *Staten, supra,* 469 F.Supp. at 1015–16. An opportunity to invoke mandatory internal housing authority grievance procedures, as set forth in 24 C.F.R. §§ 966.50, *et seq.,* must be accorded to the evictee. *See Noble, supra,* 617 F.Supp. at 251–52. Then, only after the grievance procedure, if invoked by the evictee, runs its course,

may the housing authority proceed to evict the tenant in accordance with state law. *See Noble, supra,* 617 F.Supp. at 252; *Staten, supra,* 469 F.Supp. at 1016; and *McMichael,* [*v. Chester Housing Authority,*] 325 F.Supp. [147,] at 149–50 [E.D.Pa.1971].

Our first observation is that the procedures utilized by the PHA in 1988–89 in reference to the Debtor, which resulted in his ultimate eviction, did not conform, in any sense, to the requirements of 24 C.F.R. §§ 966.4(*1*)(2) and (3), which provide as follows:

(*1*) *Termination of the lease.* The lease shall set forth the procedures to be followed by the PHA and by the tenant in terminating the lease which shall provide:

(1) That the PHA shall not terminate or refuse to renew the lease other than for serious or repeated violation of material terms of the lease such as failure to make payments due under the lease or to fulfill the tenant obligations set forth in § 966.4(f) or for other good cause.

(2) That the PHA shall give written notice of termination of the lease of:

(i) 14 days in the case of failure to pay rent;

(ii) A reasonable time commensurate with the exigencies of the situation in the case of creation or maintenance of a threat to the health or safety of other tenants or PHA employees; and

(iii) 30 days in all other cases.

(3) That the notice of termination to the tenant shall state reasons for the termination, shall inform the tenant of his right to make such reply as he may wish and of his right to request a hearing in accordance with the PHA's grievance procedure.

The eviction of the Debtor here was preceded by no written notice except the note left at his home by Wingate in November, 1988, *see* Finding of Fact 7, page 211 *supra,* simply telling him to contact Wingate "prior to going to court." Clearly, this note was not sufficient to constitute a notice of termination of the lease. Further, no mention of the Debtor's right to a griev-

ance hearing, pursuant to 24 C.F.R. §§ 966.50, *et seq.,* is imparted therein. The language of the note, suggesting that it is being dispatched *"prior to going to court"* is, moreover, affirmatively misleading, as it strongly suggests that a court hearing *will* be accorded to the Debtor prior to his eviction. As it developed, no court hearing was provided, since the PMC allowed the PHA to employ the truncated procedure allowable when there is an alleged "termination of a lease," as well as a prior default in rent, alleged in a complaint which leads to an Agreement.

The response of the PHA to this argument is that the Debtor received all of the notices required by § 966.4(*1*) over three years before in 1985. Implicit in this position is the argument that, in entering into the March 6, 1985, Agreement, the Debtor waived the right to any further notice of termination or right to a grievance hearing.

At this point, the reasoning in our prior decision in *In re Burch,* 88 B.R. 686, 692–94 (Bankr.E.D.Pa.1988), citing to a case which is factually analogous to the instant proceeding, *Berlin v. Aluisi,* 57 Md.App. 390, 470 A.2d 388 (1984), becomes relevant. There, we pointed out, 88 B.R. at 693, the due process deficiencies inherent in

[u]tilizing a judgment previously obtained on the basis of certain defaults … as a basis for remedying the alleged post-judgment defaults which a court has not determined are actionable.

We likened such a process to an attempt "to enforce a pre-default 'confessed judgment' against the Debtor." *Id. See In re Souders,* 75 B.R. 427, 432–38 (Bankr.E.D. Pa.1987) (use of confessed judgments in Pennsylvania is violative of debtors' due process rights and is hence unconstitutional).

The *Berlin* case involved a situation almost identical to that here. A judgment for back rent and possession of a premises was entered. 470 A.2d at 389. The tenant paid the amount deemed owed per the judgment. *Id.* The landlord contended that the defendant-sheriff wrongfully refused to evict the tenant because she owed additional post-judgment rent. *Id.* The court upheld the sheriff's actions, *inter alia* on the

ground that to interpret the law as the landlord suggested would violate the tenant's due process rights. *Id.* at 392.

The testimony of Simpson indicated sensitivity to the issue raised in the *Burch* and *Berlin* cases. He stated that, if a landlord has a judgment for non-payment of rent only, payment of rent equal to the amount of the judgment forecloses further judicial action on that judgment. The landlord must then file an entirely new proceeding and obtain a new judgment if the landlord wishes to evict the tenant on the basis of a new default.

█ In the same way, the Debtor is entitled to a new notice of an attempt to terminate his lease and of his right to grieve a claim of a subsequent default of an Agreement reached in the PMC. Here, the Debtor's colorable defenses based upon the incorrect calculation of his rents, and the waiver and estoppel issues discussed here, may have resulted in a halt of the eviction process had the Debtor been accorded the full opportunity to which he was entitled to raise them.

At bottom, the PHA's argument is a contention that the Debtor, by the act of his and Schneider's signing the March 6, 1985, Agreement form, waived the procedural protections otherwise accorded to the Debtor. *Compare Burch,* 86 B.R. at 692 (court there rejects any possibility that the debtor and counsel actually meant to waive their due process rights). We disagree. The requirements of 24 C.F.R. § 966.4(*1*) are mandatory. *See, e.g., Noble, supra,* 617 F.Supp. at 251–52. They cannot be waived. Lease provisions such as clauses allowing use of confession of judgment or a waiver of any legal notices or proceedings to which a public-housing tenant is otherwise entitled are prohibited. 24 C.F.R. §§ 966.6(a), (d), (e).

The aforesaid Regulations are also relevant in discounting the significance of a crucial distinction made here by Simpson, *i.e.,* allowing the PHA to use the truncated

proceeding rather than filing a new complaint because, on the Landlord & Tenant Complaint, the PHA checked item "B," *i.e.,* termination of the term of the lease. It must be recalled that public housing leases can be terminated only for "good cause." 24 C.F.R. § 966.4(*1*)(1); and *Sudler, supra,* 71 B.R. at 787. Therefore, unlike a private-housing leasehold, a public-housing leasehold is perpetual, as long as the tenant does not voluntarily terminate same, provide "good cause" for eviction, or otherwise become ineligible therefor. Hence, it was improper for the PHA to complete item "B" of the Complaint form as if the Debtor had a private-housing lease which may have ended as of a certain date. It was also an error on the part of the PMC to treat a checking of item "B" in a matter concerning a public-housing lease as it would have treated a checking of this item in the context of a private-housing lease, which clearly may have come to an end despite full compliance with its terms by the tenant. The PMC should treat all public-housing matters, except those where judgment is based upon "item C," *i.e.,* other lease violations,[2] precisely as it does private-housing matters where only item "A" is checked on the form.

Finally, we should note our concern that the entire procedure utilized by the PMC in enforcement of Agreements is subject to due-process challenge. One questionable aspect is its unwritten policy to treat the PHA differently than any other landlord-litigants. There would seem to be little, if any, basis for treating *any* particular litigant differently than the rules of a court allow. If PMCRCP 126d prohibits issuance of an alias writ more than six (6) months after a judgment is entered, then this Rule not only should, but must, be applied to the PHA, as well as to other litigants. The fact that CLS or any other organization allegedly speaking for tenants stipulated to the contrary should not be relevant. A court cannot change its own rules as written simply because certain litigants wish to

---

**2.** Counsel for PHA stated, in a colloquy at the end of the proceedings on February 21, 1988, that its intractability in this matter was due to the fact that it had unarticulated "additional grounds" for wanting to evict the Debtor. It is, however, axiomatic that, if the PHA has other

grounds for wanting to evict the Debtor, it must allege and prove them before evicting him. It cannot justify a defective judgment for possession and cling to same on unproven and unarticulated "other" grounds.

or even agree to employ different procedures.

Furthermore, we question whether the unwritten, truncated procedure recited by Simpson and set forth at Finding of Fact 12, pages 211–12 *supra*, can withstand constitutional muster in any event. First, the procedure is not codified by Rules, which renders its employment suspect. More substantively, it seems to us that, if a party wishes to transform an executory agreement into a totally-enforceable judgment, that party must be obliged to present a motion, after reasonable notice to the adverse party, which comes before the court for disposition. We note that, in *Mathews v. Eldridge*, 424 U.S. 319, 345, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976), the Supreme Court held that the following three elements must be considered to determine whether particular procedures satisfy the requirements of due process in the context of a given fact situation:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Accord, Adams*, 94 B.R. at 846–48.

The private interest here is very strong, since the outcome will result in loss of *shelter* to a person likely to be of very limited means. Sensitivity to this issue has undoubtedly motivated the PMC to establish *some* procedure short of merely accepting the landlord's *ex parte* Affidavit as a basis for proceeding. This procedure, however, featured the following notice requirements: (1) a single, regular-mail letter, which (2) fails to set forth or even summarize the contents of the Affidavit of default, and (3) which provides only five days to respond, and (4) even then, to respond in a manner which is not officially to the court and hence of which no record can be made. A more reliable form of notice and a procedure which better guarantees an opportunity of the tenant to a judicial determination of whether an Agreement is violated would seem necessary. The present procedure creates a risk of an erroneous deprivation of a leasehold to a tenant. Establishment of a procedure, according to specific rules, which assures judicial oversight of the agreement-enforcement process would not appear to be unduly burdensome.

We were also impressed with that portion of Simpson's testimony which indicated that, being regulated only by *unwritten* rules, the PMC procedure for enforcing agreements tends to be *ad hoc* and, consequently, arbitrary. The crucial distinction as to whether the landlord alleging a violation of an agreement can use the truncated procedure, must file a new complaint, or where the PMC sets up a hearing after receipt of the landlord's Affudavut if default—a third variation which Simpson introduced near the end of his testimony as appropriate when the court administrator has a question as to whether "an agreement was good or bad"—appears to be made by non-judicial personnel on the basis of subjective factors. While it is well and good to allow court procedures to be flexible, there is sometimes a lack of distinction between flexibility and total lack of procedural form, which constitutes a denial of procedural due process.

These observations cast additional layers of doubt upon a procedure which already, as to this particular Debtor, evinces serious due process deficiencies. We therefore conclude that the compromise of the Debtor's due process rights in the termination of his PHA tenancy in the PMC process in issue requires that we accord him certain relief.

4. **The Debtor Should be Entitled to be Reinstated to a Public–Housing Tenancy, Although His Lack of Certain Equities Shall Make This Relief Conditional on His Accepting a Unit Appropriate to His Family Size and Conditional on His Remittance of His Utility Rebates to the PHA and Forfeiture of His Right to Recover Preferences.**

Although we are prepared to grant significant relief to the Debtor, we find this

proceeding to be a rather close case, due to the lack of certain equities in favor of the Debtor. Even allowing for his age, the Debtor was grossly negligent in allowing a substantial rent delinquency in excess of $3,300.00 to accumulate against him. Also, he responded only sporadically to PHA communications and never returned to CLS for assistance until, apparently, *after* he was evicted. Had it not been for the testimony of Simpson, which unintentionally portrayed the due process flaws in the utilization of the truncated PMC Agreement-enforcement procedure, we may well have ruled against the Debtor. The Debtor's presentation was not sufficiently impressive to cause us to grant him substantial preliminary relief. Therefore, as in the case of the two young women whose somewhat-doubtful claims to tenancies we considered in *Adams*, we shall reinstate the PHA tenancy of the Debtor only on certain conditions.

First, we observe that the Debtor is, for the most part, an "empty-nester," as his only dependent at present is an apparently upwardly-mobile college student. We do not believe that the Debtor's shelter needs merit a entire house, especially when such a unit is undoubtedly needed by larger, homeless families. As in the case of Vera Adams in the *Adams* matter, we shall therefore order only that the PHA offer the Debtor a suitable unit which is the appropriate size for his "family."

Secondly, we shall require the Debtor to choose between reinstatement of a public-housing tenancy and an attempt to recover his previous $600.00 rental payment and utility rebates as preferential payments. We do not find that this Debtor, whose own negligence was certainly a substantial factor contributing to his eviction, should be entitled to recover both.

Relief is granted only as to the PHA, and not to the individual Defendants, and no monetary relief is awarded. The record does not support a conclusion that any of the individual Defendants are legally responsible for the violations of the Debtor's rights. The PHA followed procedures authorized by the PMC. In light of his own negligence, the Debtor is fortunate to recover so much as a tenancy in housing appropriate to his needs from PHA.

### E. CONCLUSION

An Order consistent with the foregoing Opinion will be entered.

### ORDER

AND NOW, this 10th day of March, 1989, after trial of the above-entitled proceeding on January 27, February 16, and February 21, 1989, and upon consideration of the parties' Briefs, it is hereby ORDERED as follows:

1. Judgment is entered in part in favor of the Debtor–Plaintiff, ELIJAH BELL (hereinafter referred to as "the Debtor"), and against Defendant PHILADELPHIA HOUSING AUTHORITY (hereinafter "PHA") only. All claims against any other Defendants are DISMISSED in their entirety.

2. The PHA is declared to have violated the right of the Debtor to due process of law, as provided by the Fourteenth Amendment of the United States Constitution; 42 U.S.C. § 1983; and as provided by the applicable federal Regulations appearing, *inter alia*, at 24 C.F.R. §§ 966.4(*1*) and 966.-50, et seq., in the termination of the lease of the Debtor.

3. The PHA is ordered to provide the Debtor with a suitable public housing unit of sufficient size for his family, and relocate him from his present place of residence at no cost to him, on or before March 30, 1989, on the condition that the Debtor withdraws all monetary claims against all Defendants.

4. The Debtor shall advise the PHA, on or before March 17, 1989, by letter, copy to PHA's counsel and the court, whether he accepts the conditions set forth in paragraph 3 of this Order.

5. In addition, and irrespective of whether the Debtor accepts the terms set forth in paragraph 3 *supra*, or not, it is permanently ORDERED that the PHA and IRA S. DAVIS MOVING & STORAGE CO. (hereinafter referred to as "Davis") are

directed to continue to cooperate fully in allowing the Debtor to recover any of his personal property left in the premises of 6014 Summer Street, Philadelphia, Pennsylvania 19139, and now or previously stored at Davis' facility at 3939 Germantown Avenue, Philadelphia, Pennsylvania, without any charges whatsoever to the said Plaintiff, as long as same are recovered by him on or before May 1, 1989.