In re Eladia FONSECA, Debtor.

Eladia FONSECA, Plaintiff,

v.

PHILADELPHIA HOUSING AUTHORITY and Edward Sparkman and James J. O'Connell Assistant U.S. Trustee, Defendants.

Bankruptcy No. 89–12608S.
Adv. No. 89–1154S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 7, 1990.

Peter D. Schneider, Community Legal Services, Inc., Philadelphia, Pa., for plaintiff-debtor.

Susan F. May, Philadelphia, Pa., for defendant-Philadelphia Housing Authority.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION/PROCEDURAL HISTORY

This proceeding provides us with a rare opportunity to further explain and illustrate the scope of our previous decision regarding the rights of parties who claim to be remaining members of tenant families in public housing, which we articulated in *In re Adams*, 94 B.R. 838 (Bankr.E.D. Pa.1989). We hold that the *Adams* decision was to be read very broadly in defining that class of persons who are "colorably" such remaining members (or "remainers") entitled to federal statutory and constitutional due process procedural rights prior to their eviction, and that the Debtor falls within this definition. However, pressed by the parties to make the final determination of whether the Debtor is entitled to certain relief available only to a full-fledged public housing tenant, we hold that she is not entitled to such relief, because we doubt whether she in fact is a remainer. These holdings, in tandem, illustrate the wide breadth of the class of individuals who we believe are entitled to due process protections prior to eviction from public housing.

The Debtor, ELADIA FONSECA (herein "the Debtor"), filed a Chapter 13 bankruptcy case on July 18, 1989. Almost nothing has transpired in the main case other than the completion of the meeting of creditors on December 13, 1989, the scheduling of a confirmation hearing on March 8, 1990, and the filing of the instant proceeding.

The first contested matter initiated in this court regarding the Debtor's tenancy status was the instant adversary proceeding, filed December 18, 1989, against the PHILADELPHIA HOUSING AUTHORITY (hereinafter "the PHA") and, as nominal parties, the Standing Chapter 13 Trustee, EDWARD SPARKMAN, and the local Assistant United States Trustee, JAMES J. O'CONNELL. The PHA answered and the proceeding came before the court for trial on its first scheduled date of February 1, 1990. A two-and-a-half-hour trial ensued. In light of Bankruptcy Rule (hereinafter "B.Rule") 7052, incorporating Federal Rule of Civil Procedure 52(a), we are obliged to render our decision in the form of Findings of Fact and Conclusions of Law.

## B. FINDINGS OF FACT

1. The Debtor is a 31-year-old single parent of two children. Of Hispanic ancestry, the Debtor suffered severe childhood injuries which have permanently damaged her one leg and both hands, she experiences seizures, and she apparently also suffers from a learning disability which caused her to attend school through only nine years of age. As a result, she is eligible for Supplementary Security Income ("SSI") benefits, for which her mother, Amparo Fonseca, is apparently her representative payee, and she cannot read or write in any language with the exception of her name and a few easily-recognizable words. While she comprehends the English language fairly well, it is far easier for her to express herself in Spanish.

2. As a result of the Debtor's English-language comprehension problems, it became necessary, in the midst of her testimony, by agreement of the parties, to utilize Rosa Sanchez, a PHA clerk who subsequently testified as a witness for the PHA, as an interpreter.

3. For at least several years prior to 1989, the Debtor resided with her parents in a PHA-owned unit at 630 North 18th Street, Philadelphia, Pennsylvania. On the last occasion when her mother completed the annual requisite Application for Continued Occupancy form (hereinafter "the CO") for the family, on March 23, 1989, the Debtor and her two children were listed as family members. The mother has never requested the PHA to revise her family composition as listed on the CO form.

4. The Debtor has applied for her own PHA unit on several occasions since 1983, but, according to PHA records, she failed to respond to PHA inquiries regarding the earlier applications, they were therefore removed from the waiting list, and the only pending application was made on October 17, 1989. The PHA, per its admissions director, Marie Hegarty, has 7,000 pending applications, and, although applicants as of 1983 have mostly been housed, it is unlikely that the Debtor's October, 1989, application will result in her being housed for several years.

5. In April, 1989, due to her inability to continue to tolerate her father's abusive alcoholic behavior, the Debtor moved herself and her children in with a friend and possibly distant cousin, Iris Arocho, who resided with her own three children in a PHA-owned unit at 1920 Mt. Vernon Street, Philadelphia, Pennsylvania.

6. On May 31, 1989, Ms. Arocho completed her own CO form, naming thereon herself, her children, and the Debtor and *her* children, as residents of that unit. Shortly thereafter, Ms. Arocho, accompanied by the Debtor, took the CO form to the PHA scattered-site office, where she was attended by Ms. Sanchez. Ms. Sanchez advised both Ms. Arocho and the Debtor that the Debtor and her children could not remain in the unit, as they rendered it overcrowded, and reiterated this advice after checking with her superiors. At some point, some unknown PHA employee apparently crossed the names of the Debtor and her children off on Ms. Arocho's CO form as submitted.

7. William Santiago, the bilingual Assistant Manager of the area in which Ms. Arocho's unit was located, visited the unit in June, 1989. He observed both the Arocho family and the Debtor's family in residence. When Ms. Arocho advised him that she intended to vacate the unit, Mr. Santiago informed both her and the Debtor that the Debtor could not simply take over the premises after her departure, as both Ms. Arocho and the Debtor appeared to wish to take place.

8. In mid-July, 1989, Mr. Santiago visited the premises again. At this time, Ms. Arocho and her children had departed, and Mr. Santiago explained to the Debtor that she could not stay in the unit and that he would have to take steps to see that she was evicted. The bankruptcy case ensued shortly thereafter.

9. The Debtor stated, when asked in Spanish on direct testimony, that she believed that Mr. Santiago had, on one occasion, told her that she could stay in the unit after Ms. Arocho's departure. However, when initially questioned on direct examination in English and again thereafter on

**194**

cross-examination with Ms. Sanchez as a Spanish interpreter, the Debtor stated that Mr. Santiago had consistently told her that she could not stay in the unit. We conclude that Mr. Santiago, who appeared to be a conscientious, soft-spoken individual, did politely advise her, on all occasions, that she could not stay in the unit, but that the Debtor, in light of her mental impairments, may have understood his politeness to indicate permission that she could stay.

10. Shirley Gray, the head of the PHA's scattered-site program, advised that she did not consider the Debtor to be even colorably a remainer because, unlike both alleged remainers in the *Adams* case, the Debtor had not ever been recognized by the PHA as a member of Ms. Arocho's household and she was not closely (if at all) related to Ms. Arocho. Therefore, Ms. Gray believed that the Debtor was a squatter entitled to no due process rights before her possession of the unit could be summarily terminated.

11. Mr. Santiago expressed a belief of applicable PHA policy similar to that expressed by Ms. Gray, and indicated that, had the Debtor not filed bankruptcy, she would have, in due time, been forcibly evicted without the filing of a landlord-tenant proceeding against her by the PHA's own self-help devices.

12. The Debtor has never paid any rent to the PHA. The PHA apparently recognizes that the automatic stay effected by the Debtor's bankruptcy filing prevents it from evicting her without obtaining relief from the automatic stay, but it has nevertheless taken no action to obtain such relief as of the present.

13. The Debtor's counsel advised that he brought this proceeding to terminate the stalemate apparently working to the Debtor's benefit, because the PHA's failure to recognize the Debtor as a tenant had prevented her from obtaining a utility allowance which the Debtor apparently believes is necessary for her to continue to sustain herself in the unit. The Complaint also alleges that repairs are necessary to the unit, which the Debtor requested that we order the PHA to make on her behalf.

14. The court expressed a preference to merely decide whether the Debtor was colorably a remainer entitled to procedural due process prior to her eviction, consistent with our holding in *Adams*, 94 B.R. at 839, 849, and allow the decision as to whether she actually was a remainer to be made in the grievance process and/or in state court. However, the Debtor's counsel insisted that an immediate determination of the Debtor's rights as a tenant was necessary, and the PHA's counsel concurred in this request, indicating that she had assembled numerous witnesses for this occasion.

## C. CONCLUSIONS OF LAW

1. The Complaint alleges, pursuant to B.Rule 7008(a), that this proceeding is not only related to the Debtor's bankruptcy case, but is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (b)(2)(B), and (b)(2)(O). It may also be core under 28 U.S.C. §§ 157(b)(2)(C), (b)(2)(E), or (b)(2)(M). *See Adams, supra*, 94 B.R. at 845. PHA admitted the averments that this proceeding is both related and core. If this were not in itself conclusive that this proceeding was in fact core and that we could decide it, *see* B.Rule 7012(b); and *In re St. Mary Hospital*, 101 B.R. 451, 454, 457 (Bankr.E.D.Pa.1989), the parties, by their counsel, consented on the record at the trial that we could determine it. *See* 28 U.S.C. § 157(c)(2). We may and therefore shall proceed to do so.

2. The Debtor does not appear to us to be a "remaining member of a tenant family," as defined in 24 C.F.R. § 912.2 (definition of "Family"). We agree with the PHA's contention that there is no historical connection between Ms. Arocho and/or the Mt. Vernon Street unit on one hand and the Debtor and her children on the other hand. Contrary to the Debtor's position, the fact that Ms. Arocho placed the names of the Debtor and her children on the CO form cannot, in itself, be deemed conclusive or even very significant. It would be unfair to other applicants for public housing to allow a tenant and a third party to unilaterally annex the third party to the tenant's "family," and thereby allow

the third party to leapfrog over other applicants on the waiting list. Unfortunately, despite the Debtor's recognized need for public housing, her legal claim to a tenancy is based only upon such unilateral acts and a doubtful claim that Mr. Santiago's statements estopped the PHA from denying her tenancy. *But see In re Bell,* 97 B.R. 208, 213–15 (Bankr.E.D.Pa.1989) (elements of both reasonable reliance upon misrepresentations and a change of the accepting party's position in accordance with misrepresentations must be proven to give rise to estoppel; here, we doubt whether misrepresentations were made and no reasonable reliance nor change of position was proven).

Since she does not appear to be a tenant of the unit, the Debtor does not appear to have any right to the forms of relief which she seeks which are dependent on her tenant-status, *i.e., inter alia,* a right to assume the lease, have PHA determine her rent, make PHA repair the unit, allow her to obtain a rental license for the unit, or make the PHA determine her proper utility allowance.

■ 3. On the other hand, the Debtor is at least colorably a remainer. In this regard, we believe that Ms. Gray has articulated a definition of "colorable" which has insufficient flexibility to meet the wide variety of factual patterns which may emerge. We do not believe that a party must have necessarily been listed on a CO as a legitimate member of a tenant's family in the past nor be closely related to the tenant to have a "colorable" right as a remainer. *See Adams,* 94 B.R. at 846–47 (CO is not always reliable).

■ Although the Debtor's situation does not present certain important indicia that she is a remainer, we also fail to conclude that she is plainly a squatter, lacking any colorable right to the premises. She has resided in the unit for a considerable period, with the express permission of the legal tenant and with the knowledge of her presence by the PHA, particularly after Ms. Arocho listed her on her CO. She has candidly not concealed her presence there. While the PHA may not be bound to all statements of its employees, it is clear that the actions and words of Mr. Santiago and Ms. Sanchez did not suggest that the Debtor and her children were obliged to remove themselves from the unit immediately. Nor would it, in our view, have been consistent with humane performance of their job duties for them to have done so under the circumstances.

We therefore believe that the Debtor is and was entitled to the due process rights of an opportunity for a grievance hearing and a state-court landlord-tenant proceeding before she can be evicted, as were the *Adams* plaintiffs. *See Adams,* 94 B.R. 845–49, 853. There is really very little to distinguish Vera Adams' situation from that of the Debtor, except that the Debtor was not exposed to the actions of the PHA which gave rise to potential damages in that case and that the Debtor was not related to Ms. Arocho very closely, if at all. *See id.* at 840–41, 853–54.

We also observe that there is no inconsistency between our conclusion that the Debtor has an entitlement to procedural due process before she may be evicted and our earlier conclusion that her ultimate eviction may be justified. As the Supreme Court recently reiterated in a unanimous opinion, *Peralta v. Heights Medical Center, Inc.,* 485 U.S. 80, 86–87, 108 S.Ct. 896, 899–900, 99 L.Ed.2d 75 (1988):

> Where a person has been deprived of property in a manner contrary to the most basic tenets of due process, "it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits." *Coe v. Armour Fertilizer Works,* 237 U.S. 413, 424, 35 S.Ct. 625, 629, 59 L.Ed. 1027 (1915). As we observed in *Armstrong v. Manzo,* [380 U.S. 545 (1965)], at 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, only "wip[ing] the slate clean ... would have restored the petitioner to the position he would have occupied had due process of law been accorded to him in the first place." The Due Process Clause demands no less....

Where such an important commodity as shelter for persons having as few resources as the Debtor are concerned, adherence to proper procedures becomes extremely significant. *See also Bell, supra,* 97 B.R. at 215–18.

Our decision in this regard works very little practical detriment to the PHA. Assuming *arguendo* that the Debtor was not a "colorable remainer" her mere possession of the unit at the time of her bankruptcy filing would obligate the PHA to successfully file a motion for relief from the automatic stay before it could proceed to evict her in any event. *See In re Sudler,* 71 B.R. 780, 786, 787–88 nn. 1 & 2 (Bankr.E.D. Pa.1987) (public housing tenant holding over after the lease has been validly terminated or re-entering the premises after a lawful eviction is provided with the protection of the automatic stay).

 Of course, if a tenant has no legal right to possession, relief from the stay would be readily granted to the owner of a premises, including the PHA. Only strong defenses to state court proceedings can prevent a bankruptcy court from granting relief from the stay in cases where, as here, we believe that the decision-making process should be relegated to bodies other than this court. *See Adams,* 94 B.R. at 839, 849. *Cf. In re Souders,* 75 B.R. 427, 432–33 (Bankr.E.D.Pa.1987) (only defenses "striking at the heart" of the validity of the movant's claim will be considered and resolved by the bankruptcy court, as opposed to being resolved in the court in which the matter proceeds after relief from the stay is granted). The decision of a bankruptcy court granting relief from the automatic stay is not, for that reason, res judicata or collateral estoppel as to any issues in the court in which the matter ultimately proceeds after relief from the stay is granted.

An Order consistent with this Opinion will be entered.

### ORDER

AND NOW, this 7th day of February, 1990, after a trial of the above-captioned proceeding on February 1, 1990, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff–Debtor, ELADIA FONSECA, and against the Defendant, PHILADELPHIA HOUSING AUTHORITY, in part only.

2. The Debtor and her children are declared to have the status of "colorable" remaining members of a tenant family, entitled to the due process rights described in *In re Adams,* 94 B.R. 838, 845–49, 853 (Bankr.E.D.Pa.1989), before they may be evicted. All other relief sought by the Debtor is, however, DENIED.